**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| ALEXANDER RICE, Individually And On Behalf Of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>        v.<br><br>GENWORTH FINANCIAL INCORPORATED, THOMAS J. MCINERNEY, JAMES S. RIEPE, WILLIAM H. BOLINDER, G. KENT CONRAD, MELINA E. HIGGINS, DAVID M. MOFFETT, THOMAS E. MOLONEY, JAMES A. PARKE, DEBRA J. PERRY, ROBERT P. RESTREPO JR.,<br><br>               Defendants. | **C.A. No.** 3:17CV00059<br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Alexander Rice ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for his own acts, which is alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1. This is a stockholder class action brought by Plaintiff on behalf of holders of the common stock of Genworth Financial Inc. ("Genworth" or the "Company") against the Company and its board of directors (the "Board") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder in connection with the proposed acquisition of Genworth by a Chinese investment holding company,

China Oceanwide Holdings Group Co., Ltd ("China Oceanwide")[1] through a merger, as detailed herein (the "Proposed Transaction").

2.     Headquartered in Richmond, Virginia, Genworth offers various financial and insurance products, including long-term care and mortgage insurance products.

3.     On October 23, 2016, Genworth and China Oceanwide announced that they had reached a definitive Agreement and Plan of Merger ("Merger Agreement") whereby Merger Sub will merge with and into Genworth, with Genworth continuing on as the surviving corporation. Pursuant to the Merger, each issued and outstanding share of Genworth common stock will be cancelled and automatically converted into the right to receive $5.43 in cash ("Merger Consideration"). The Proposed Transaction is valued at approximately $2.7 billion.[2]

4.     Defendants (defined below) violated the above-referenced sections of the Exchange Act, and rules and regulations promulgated by the U.S. Securities and Exchange Commission ("SEC"), by filing a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the SEC on December 21, 2016.  The Proxy Statement recommends that Genworth stockholders exchange their shares pursuant to the terms of the Merger Agreement based, among other things, on the opinion rendered by the Company's financial advisors, Goldman, Sachs & Co. ("Goldman Sachs") and Lazard Frères & Co. LLC ("Lazard") as

---

[1]     China Oceanwide is a limited liability company formed in the People's Republic of China ("PRC"). The merger will be effected through acquisition entities Asia Pacific Global Capital Company, Ltd. ("Parent"), a limited liability company formed in the PRC, and Asia Pacific Global Capital USA Corporation ("Merger Sub"), an indirect wholly-owned Delaware subsidiary of Merger Sub. The Proposed Transaction must be approved by the Committee on Foreign Investment in the U.S ("CFIUS").

[2]     China Oceanwide also pledged $600 million in cash to help Genworth manage its debt load and $525 million to its U.S. life insurance business.

its financial advisors and other internal and external factors the Genworth Board purportedly considered to make the recommendation.

5.     The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Genworth's public stockholders as the Merger Consideration represents only a 4.2% premium to the Company's closing price of $5.21 on October 21, 2016, the last trading day before the Proposed Transaction was announced.

6.     Genworth's true value and its growth prospects are evidenced by the Company's reported financial results leading to the Merger Agreement.  For example, the Company's reported earnings exceeded analyst estimates by 50% in the quarter ended March 30, 2016.[3] Likewise, in the quarter ended June 29, 2016, the Company beat analysts' expected $0.21 earnings per share by $0.04, reporting EPA of $0.25 per share.[4]   Indeed, certain analysts had set a stock price target of $5.25.

7.     Genworth's stock may be artificially depressed due to recent efforts to restructure its U.S. life insurance businesses by unstacking its Life and Annuity Insurance Company ("GLAIC") from the Genworth's Life Insurance Company ("GLIC") and questions regarding its maturing debt burden in 2018. China Oceanwide even recognized these factors in the press release describing its purpose in making the acquisition.

8.     From China Oceanwide's perspective, Genworth represents a large and strategic foothold in the U.S. insurance industry.  China Oceanwide recognized an opportunity to cash in

---

[3]        http://finance.yahoo.com/news/genworth-gnw-q1-earnings-beat-150403009.html.
[4]        http://www.newsoracle.com/2016/10/31/comprehensive-stock-analysis-of-genworth-financial-inc-nysegnw/.

on Genworth's undervalued stock price by acquiring the Company before its stockholders realized the impact of the Company's improving financial condition.

9.     Thus, the consideration being offered to Genworth public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of Genworth common stock is materially in excess of the amount offered given the Company's recent financial performance together with its prospects for future growth and earnings.

10.     The market has reacted negatively to the announcement with Genworth's stock declining steadily from $4.79 on October 24, 2016 to around $3.89 on January 6, 2017.

11.     To ensure the success of the Proposed Transaction, the Genworth Board locked up the deal by agreeing to impermissible "deal-protection" devices.  For example, the Board agreed to: (i) a non-solicitation provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision  mandating that the Company inform China Oceanwide of any competing offers, provided all information regarding a competing offer, and give China Oceanwide five business days in which to match a competing offer that the Board determines is superior to the Proposed Transaction; and (iii) a $105 million termination fee to be paid to China Oceanwide if the Board agrees to a competing proposal, effectively deterring other potential suitors from making a superior proposal.

12.     In pursuing the plan to facilitate the acquisition of Genworth by China Oceanwide for grossly inadequate consideration, through a flawed process, the Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing the Proxy Statement with the SEC on December 21, 2016.  The Proxy Statement recommends that Genworth stockholders vote in favor of the Proposed

Transaction based on misleading information and without disclosing all material information which renders the Proxy Statement misleading.

13.     Specifically, as more fully alleged below, the Proxy Statement is false and/or materially misleading concerning the following: (i) certain information in the background of the Proposed Transaction; and (ii) certain projected financial measure and the financial analyses of the Proposed Transaction performed by Goldman Sachs and Lazard, Genworth's financial advisors.

14.     For these reasons and as set forth in detail herein, Plaintiff seek to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith and due care.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  17 C.F.R. §240.14a-9.

16.     The Court has jurisdiction over Defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Genworth maintains its primary place of business in this District.

## THE PARTIES

18.     Plaintiff is, and at all relevant times was a shareholder of Defendant Genworth since prior to the wrongs complained of herein.

19.     Defendant Genworth is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 6620 West Broad Street Richmond, VA 23230-1716.  Genworth's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GNW." Genworth is described on its website as follows:

> Genworth Financial, Inc. (NYSE: GNW) is a Fortune 500 insurance holding company committed to helping families achieve the dream of homeownership and address the financial challenges of aging through its leadership positions in mortgage insurance and long term care insurance.

20.     Defendant Thomas McInerney ("McInerney") is President and Chief Executive Officer ("CEO") of Genworth. McInerney is and has been an executive and director of Genworth since 2013.

21.     Defendant James S. Riepe ("Riepe") is and has been a non-executive Chairman of the Board of Genworth since 2012.

22.     Defendant William H. Bolinder ("Bolinder") is and has been a director of Genworth since 2010.

23.     Defendant G. Kent Conrad ("Conrad") is and has been a director of Genworth since 2013.

24.     Defendant Melina E. Higgins ("Higgins") is and has been a director of Genworth since 2013. Higgins retired in 2010 from a nearly 20-year career at Goldman Sachs, where she served as both a Managing Director and a Partner.

25.     Defendant David M. Moffett ("Moffett") is and has been a director of Genworth since 2012.

26.     Defendant Thomas E. Moloney ("Moloney") is and has been a director of Genworth since 2009.

27.     Defendant James A. Parke ("Parke") is and has been a director of Genworth since 2004.

28.     Defendant Debra J. Perry ("Perry") is and has been a director of Genworth since 2016.

29.     Defendant Robert P. Restrepo Jr. ("Restrepo") is and has been a director of Genworth since 2016.

30.     The Defendants above are collectively referred to hereinafter as the "Individual Defendants."

31.     Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

32.     Collectively, the Individual Defendants and Genworth are referred to herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

33.     Plaintiff bring this action on his own behalf and as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure, on behalf of all holders of Genworth common stock who are holders of record and entitled to vote on the Proposed Transaction and are being and will be harmed by Defendants' actions described below (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

34.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable. As of December 15, 2016 Genworth had outstanding approximately

586,814,568 shares of Common Stock. Class members are believed to be geographically dispersed.

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(d)     To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

35.    There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

      (b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

      (c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated as presently anticipated.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

36.    Genworth provides consumers with mortgage insurance products that allow people to purchase homes.  The Company also offers services ranging from homeownership education and assistance programs to individual and group long-term care insurance products. The Company operates through five business segments: U.S. Mortgage Insurance, Canada Mortgage Insurance, Australia Mortgage Insurance, U.S. Life Insurance, and Runoff.[5]

37.    In addition to the five business segments, Genworth conducts other business activities which include debt financing expenses that were incurred by Genworth Holdings, Inc.,[6] unallocated corporate income and expenses, and the results of other businesses that are managed outside of their business segments, including international mortgage insurance businesses and discontinued operations.[7]

38.    U.S. Mortgage Insurance offers mortgage insurance products principally insuring prime-based, individually underwritten residential mortgage loans ("flow mortgage insurance"). Genworth also provides mortgage insurance on a bulk basis ("bulk mortgage insurance") with

---

[5]    www.reuters.com/finance/stocks/companyProfile?symbol=GNW.

[6]    Genworth Holdings, Inc. ("Genworth Holdings") (formerly known as Genworth Financial, Inc.) was incorporated in Delaware in 2003 in preparation for an initial public offering of Genworth's common stock.

[7]    www.sec.gov/Archives/edgar/data/1276520/000119312516482185/ d52855d10k.htm#tx52855_1.

nearly all of their bulk writings being prime-based. For the year ended December 31, 2015, the segment's income from continuing operations available to Genworth's common stockholders and net operating income was $179 million for each measure.

39.     Canada Mortgage Insurance offers primary flow and bulk mortgage insurance products in the Canadian market. Their primary flow mortgage insurance policies are portable, which allows borrowers to transfer the mortgage default insurance associated with the mortgage loan. Also, their bulk mortgage insurance policies provide lenders with capital relief from applicable bank regulatory capital requirements and facilitate the securitization of mortgages in the Canadian market.

40.     Australia Mortgage Insurance offers primary flow (also known as "lenders mortgage insurance") and bulk mortgage insurance products in the Australian market. Residential mortgage loans in Australia have variable rates with 25 to 30 year terms. The segment also provides bulk mortgage insurance in Australia mainly to regulated lenders with a view to securitize self-originated Australian residential loans.

41.     U.S. Life Insurance a plethora of long-term care ("LTC") insurance products. The Company has launched IncomeAssurance$^{SM}$, a medically underwritten single premium immediate annuity product. The product is designed to provide a lifetime, guaranteed income solution to help fund care or other priorities. As opposed to health insurance, LTC insurance provides coverage for skilled and custodial care provided outside the context of a medical facility.

42.     The Runoff segment has non-strategic products, including: (1) variable annuity, (2) variable life insurance, (3) institutional, (4) corporate-owned life insurance, (5) accident, and (6) other health insurance products. Variable annuities provide the Company with fees, including mortality and expense risk charges. The institutional products consist of funding agreements,

funding agreements backing notes ("FABNs") and guaranteed investment contracts ("GICs"). The segment competes with federal and foreign national agencies that provide similar products.

43.    In last couple of years the Company has suffered losses on long-term care coverage but, as described below, was pursuing divestitures to pay down more than $500 million in debt maturing in 2018 and launched a long term plan to address certain financial trouble spots.  Troubles in the bond market factored into the Company's efforts to refinance.  Consequently, and due to other issues, the Company's stock has suffered declines.

## B.    The Proposed Transaction and the Flawed Process

44.    The Merger Agreement was executed on October 21, 2016 and announced on October 23, 2016:

> RICHMOND, VA & BEIJING (October 23, 2016) – China Oceanwide Holdings Group Co., Ltd. ("China Oceanwide") and Genworth Financial, Inc. (NYSE: GNW) ("Genworth") today announced that they have entered into a definitive agreement under which China Oceanwide has agreed to acquire all of the outstanding shares of Genworth for a total transaction value of approximately $2.7 billion, or $5.43 per share in cash. The acquisition will be completed through Asia Pacific Global Capital Co. Ltd., one of China Oceanwide's investment platforms. The transaction is subject to approval by Genworth's stockholders as well as other closing conditions, including the receipt of required regulatory approvals.
>
> As part of the transaction, China Oceanwide has additionally committed to contribute to Genworth $600 million of cash to address the debt maturing in 2018, on or before its maturity, as well as $525 million of cash to the U.S. life insurance businesses. This contribution is in addition to $175 million of cash previously committed by Genworth Holdings, Inc. to the U.S. life insurance businesses. Separately, Genworth also announced today preliminary charges unrelated to this transaction of $535 to $625 million after-tax associated with long term care insurance (LTC) claim reserves and taxes. Those items are detailed in a separate press release. The China Oceanwide transaction is expected to mitigate the negative impact of these charges on Genworth's financial flexibility and facilitate its ability to complete its previously announced U.S. life insurance restructuring plan. Genworth believes this transaction is the best strategic alternative to maximize stockholder value.
>
> James Riepe, non-executive chairman of the Genworth Board of Directors said, "The China Oceanwide transaction is the result of an active and extensive review

process conducted over the past two years under the supervision of the Board and with guidance from external financial and legal advisors. The Board is confident that the sale of the company to China Oceanwide is the best path forward for Genworth's stockholders."

Upon the completion of the transaction, Genworth will be a standalone subsidiary of China Oceanwide and Genworth's senior management team will continue to lead the business from its current headquarters in Richmond, Virginia. Genworth intends to maintain its existing portfolio of businesses, including its MI businesses in Australia and Canada. Genworth's day-to-day operations are not expected to change as a result of this transaction.

China Oceanwide is a privately held, family owned international financial holding group founded by Mr. Lu Zhiqiang. Headquartered in Beijing, China, China Oceanwide's well-established and diversified businesses include operations in financial services, energy, culture and media, and real estate assets globally, including in the United States. Businesses controlled by China Oceanwide have more than 10,000 employees globally.

"Genworth is an established leader in both mortgage insurance and long term care insurance, which are markets that present significant long-term growth opportunities," added Mr. Lu, Chairman of China Oceanwide. "We are impressed by Genworth's purpose and its focus on helping people manage the financial challenges of aging as well as achieving the dream of homeownership. In acquiring Genworth and contributing $1.1 billion of additional capital, we are providing crucial financial support to Genworth's efforts to restructure its U.S. life insurance businesses by unstacking Genworth Life and Annuity Insurance Company (GLAIC) from under Genworth Life Insurance Company (GLIC) and address its 2018 debt maturity. In order to close the transaction and achieve these objectives, we have structured the transaction with the intention of increasing the likelihood of obtaining regulatory approval."

Tom McInerney, President & Chief Executive Officer of Genworth concluded, "We believe that this transaction creates greater and more certain stockholder value than our current business plan or other strategic alternatives, and is in the best interests of Genworth's stockholders. China Oceanwide is an ideal owner for Genworth going forward. They recognize the strength of our mortgage insurance platform and the importance of long term care insurance in addressing an aging population. The capital commitment from China Oceanwide will strengthen our business and increase the likelihood of obtaining regulatory approval."

Genworth will continue to focus on its key financial priorities, including strengthening the balance sheet and stabilizing and improving ratings over time, particularly in its U.S. MI business. Genworth will also continue to focus on its key operational priorities, most notably executing its multi-year LTC rate action plan, which is essential to stabilizing the financial position of the legacy LTC business.

China Oceanwide has no current intention or future obligation to contribute additional capital to support Genworth's legacy LTC business.[8]

45.     The process that led to this announced Proposed Transaction was flawed from the beginning.

46.     Genworth's stock price was as recently as October 2014, trading at nearly $14.00 per share. Proxy, 30. But management and the Board miscalculated in structuring certain operations. Thus, the Company experienced meaningful increases in adverse claims experience for its LTC insurance products, particularly in older blocks of policies, resulting in significant deterioration in U.S. life insurance income. During the third quarter of 2014, Genworth completed its annual review of its LTC insurance claim reserves and determined it would be required to significantly increase its LTC insurance claim reserves, also referred to as disabled life reserves. *Id.*

47.     These issues are summed up by Defendants in the Proxy:

> Because Genworth Holdings is the obligor on a substantial amount of public unsecured debt and is a holding company that relies on dividends or other distributions from its insurance company subsidiaries to service, refinance and/or reduce that debt, the deterioration of the LTC insurance business and the risk of further future deterioration created several key concerns. Not only would Genworth's life insurance subsidiaries that carry out Genworth's LTC insurance business (including GLIC) be unable to pay the previously planned 2014 and 2015 dividends, but the negative capital impact of the LTC claim reserves on GLIC, also prevented GLAIC, a subsidiary of GLIC that is Genworth's principal life insurance and annuity business insurance subsidiary, from paying dividends indirectly to Genworth Holdings, in effect trapping cash below GLIC. Therefore, Genworth Holdings would not be able to rely on those dividends to service, refinance and/or reduce Genworth Holdings' debt. At the same time, US MI, although not a subsidiary of Genworth Holdings, but a potential source of credit support to Genworth for its part also required significant additional capital to satisfy the Private Mortgage Insurer Eligibility Requirements ("*PMIERs*") established by Fannie Mae and Freddie Mac which were proposed to come into effect by the end of 2015. Genworth Holdings'

---

[8]     www.sec.gov/Archives/edgar/data/1276520/000119312516744407/d275076dex991.htm.

substantial debt, together with the inability of the U.S. life insurance business and US MI to help, at such time, service this debt, created refinancing risk for Genworth Holdings' debt and the risk of negative ratings downgrades for Genworth, which in turn could lead to ratings downgrades for Genworth's mortgage businesses and a corresponding negative impact on the performance of Genworth's mortgage insurance businesses. As a result, reducing Genworth Holdings' debt and strengthening the capital of Genworth's subsidiaries, including through potential asset sales, were seen as key priorities.

Proxy, 31.

48. Sensing that cash flow may be impacted, which would negatively impact lucrative equity compensation entitlements, Defendants began to look to sell the Company and engaged Goldman Sachs and Lazard to advise the Board on among other things strategic transactions in early 2015. Proxy, 32. Around this time frame, the Company also began to sell certain assets, e.g., its lifestyle protection insurance business (utilizing the services of yet another financial advisory, Barclays Capital, Inc.). *Id.*

49. Some of the options for the Company's future that the Board considered include the following:

- restructuring and integration of Genworth's headquarters operations with its U.S. life insurance business to reduce costs;

- execution of its previously planned sale of Genworth's lifestyle protection insurance business and the sale of the European mortgage insurance business which the Board had determined in February 2015 would be an appropriate means to exit the European mortgage insurance market, generate capital from a lower return business and support Genworth's plan to be PMIERs compliant;

- the "recapture" by GLAIC of certain U.S. life insurance blocks of business that it had ceded to Brookfield Life and Annuity Insurance Company Limited, Genworth's primary Bermuda domiciled reinsurance subsidiary (which we refer to as "*BLAIC*"), and the subsequent "repatriation" of LTC insurance blocks of business and single premium deferred annuity blocks of business that GLIC had ceded to BLAIC (the "recapture" transactions were completed by July 1, 2016 and the "repatriation" transaction was completed on October 1, 2016);

14

- potential sale of all or part of the U.S. life insurance and annuity businesses excluding the LTC insurance business (which we refer to as the "*L&A businesses*"), in order to reduce the level of Genworth Holdings' debt; and

- preservation of future options to separate the LTC insurance business from Genworth's mortgage insurance businesses, with the goal, among other things, of preventing any potential future deterioration in the LTC insurance business from having a negative impact on the ratings, competitiveness in the market place and value of Genworth's mortgage insurance businesses.

Proxy, 32.

50.     In or around May 2015, the Company received a written proposal to acquire the Company's stock in an all cash transaction at $12.50 per share, a proposal that was later reduced to between $10-11 per share (after the Board reduced the position in Genworth Australia to 52% ownership)(Proxy, 34) and later revised its proposal to the acquisition of Genworth's U.S. life insurance business (including the L&A businesses and LTC insurance business), and related run-off asset. Proxy, 35. Other entities also made proposals, including companies A, C and D. [9] The terms of these proposals is not disclosed in the Proxy. *Id.*

51.     The discussions with Company B eventually stalled in the summer of 2015.  The Board pursued other potential transactions to sell portions of this Company's businesses. Proxy, 36.  The discussions with Company A similarly stalled, but were renewed in December 2015 and continued into the summer of 2016 over the purchase of the L&A business and iterations of this business, and the LTC business. Various transaction options were discussed with Company A that also involved meetings with state insurance regulators. Proxy, 38-43. These discussions continued into 2016. Proxy, 45.

---

[9]     For convenience, Parties A, B, C, and D, may also collectively be referred to herein as "Interested Parties."

52.     Securities fraud class actions were filed regarding the Company's LTC insurance business and its Australia mortgage insurance business, about which the Board had ongoing discussions during the process to sell the Company. *See e.g.,* Proxy, 45.[10]

53.     While the discussions with Company A were ongoing, Defendants also engaged in discussions with China Oceanwide in May 2015, and in January 2016 with Company D, about an acquisition of Genworth. Proxy, 43.

54.     In February, 2016, Company D made another proposal that involved two options for the Board to consider. Proxy, 45.  The discussions with Company D ceased in March 2016. Proxy, 47.

55.     The Board continued to engage with and consider transactions with Company A (regarding the L&A and LTC businesses) and China Oceanwide through the spring  and summer of 2016. Proxy, 48.

56.     The Board eventually and belatedly formed a special committee ("STC") to purportedly independently evaluate and consider strategic transactions. Proxy, 47.

57.     Eventually, the STC and the Board were simultaneously considering a proposal to sell the L&A business to Company A and the remaining business to China Oceanwide.

58.     Between August 3, 2016 and the date the Merger Agreement was executed, Genworth's stock price nearly doubled in price, increasing from $2.75 to $5.21. Proxy. 53-54.

59.     The STC and the Board continued to engage Company A and China Oceanwide through October 2016 and eventually elected to pursue a sale of the entire Company only to China Oceanwide at the Merger Consideration of $5.43. The Board considered this offer and was

---

[10]     *In re Genworth Fin. Sec. Litig.*, No. 3:14-CV-682 (E.D. Va.).  There also is a securities fraud action in New York district court. *In re Genworth Fin. Sec. Litig.*, No. 1:14-cv-02392 (S.D.N.Y.). Derivative cases also were filed in August, 2015, which exposed the Board to liability arising from those allegations.

presented with the Lazard and Goldman Sachs presentations in support of their fairness opinions at a board meeting on October 20-21, 2016 and thereafter voted to approve the Merger. Proxy, 63.

60.    During this process, the Board continually reviewed and assessed the Company's historic and prospective internal non-public financial measures, including non-GAAP and GAAP measures. *See e.g.,* Proxy, 47 (reviewed at the March 16-17, 2016 board meetings), Proxy Statement 53 (reviewed the "July Projections" at the July 26-27, 2016 board meetings).  The Company's management again updated Genworth's financial projections in September 2016 through 2021, claiming in part that there was a reasonable likelihood that the Company would have to increase its LTC insurance claim reserves and related assumption changes would be made, and made certain additional assumptions regarding alternatives that Genworth may explore to access capital to pay down its upcoming debt maturing in 2018, preserve the value of US MI and reduce overall debt, in each case, assuming that Genworth and China Oceanwide would not be able to sign a definitive agreement with respect to a potential transaction involving the acquisition of all of the capital stock of Genworth by China Oceanwide  These September 2016 projections were provided to China Oceanwide. These September projections were revised and presented to the Board at an October 9, 2016 Board meeting, at which the Board directed management to further revise the projections downward.  After review of the down-adjusted projections at a Board meeting held on October 13-14, 2016, the Board directed management to again revise the projections downward further, which finally resulted in a set of projections that could support a fairness opinion at the negotiated offer price, relied on by Lazard and Goldman Sachs.

C.    **The Proposed Transaction Undervalues Genworth's Shares**

61.    The per share consideration being offered to Genworth public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic

value of Genworth's common stock based on the Company's long-term plans for future growth and earnings, and recent earnings results, exceeds the amount offered by China Oceanwide.

62.     Indeed, Allen Cooke, of Broxton Capital Advisors that follows the Company, agreed that the Proposed Transaction, despite the Board's optimism, severely undervalues company's book value:

> GNW may have been extensively shopped without attracting a buyer. The bid of $5.43 doesn't really work because the current net value is $8-12 per share, [t]he holding company DCF value is $16.96 and the book value is $19.40. This is our report regarding subsidiary values, the long-term care (LTC) operations, share value analysis and alternatives for shareholders. The conclusion is below. If we had to characterize this deal, we would say it makes no sense and jeopardizes the company. An avalanche of 262 claims could be waiting if the deal is completed. The shareholders are required to approve the deal, which we recommend they deny, but the holders are graciously being offered an extortion dilemma in order to quell the why factor. Sell now! Or the company will suffer something worse! As you will see, as we slowly draw back the curtains, the company is worth more, there is stability and strength at the LTC unit, additional liquidity if desired and there are indeed suitable additional choices available.[11]

63.     A review of recent earnings reports and statements by the Company undercuts the Board's recommendation to Genworth shareholders to vote in favor of the Proposed Transaction.

64.     On February 4, 2016, the Company announced a restructuring plan for its U.S. life insurance businesses to: (i) suspend sales of its traditional life insurance and fixed annuity products; (ii) further reduce expense levels in 2016; (iii3) repatriate existing business from Brookfield Life and Annuity Insurance Company Limited ("BLAIC"), its primary Bermuda domiciled reinsurance subsidiary, to its U.S. life insurance companies in 2016; and (iv) separate and isolate its long-term care ("LTC") business.

65.     For the first quarter 2016 ending March 31, 2016, the Company's earnings per share

---

[11]     http://seekingalpha.com/article/4027360-genworth-holders-offered-25-percent-book-value-insurance-company-5_43-share (emphasis supplied).

("EPS") was in line with analysts' expectations that had factored in prior negative industry and Company-specific factors.  Genworth reported net income of $53 million, or $0.11 per diluted share compared with net income of $154 million, or $0.31 per diluted share, in the first quarter of 2015.  Net operating income for the first quarter of 2016 was $103 million, or $0.21 per diluted share, compared with net operating income of $154 million, or $0.31 per diluted share, in the first quarter of 2015.  Net income and net operating income in the quarter included $54 million after-tax, or $0.11 per diluted share, of litigation settlement and legal expenses.[12]

66.     Progress on its restructuring plan was reported as following:  (i) Suspending all sales of traditional life insurance and fixed annuity products on March 7, 2016; (ii) Reducing cash expenses by approximately $135 million pre-tax on an annualized basis. The company still expects to achieve total expected annualized cash expense reductions of $150 million or more by the end of the second quarter of 2016; (iii) Recapturing a block of universal life insurance business from BLAIC to the U.S. life insurance companies, effective April 1, 2016, representing an additional step completed toward the repatriation of BLAIC; and (iv) Successfully completing a bond consent solicitation providing additional strategic and financial flexibility and demonstrating progress toward the isolation of the LTC business.

67.     McInerney commented on the results as follows:

> We are pleased with the continued strong performance of our MI businesses and improved results in our U.S. life insurance businesses during the quarter … We also enhanced our strategic and financial flexibility by proactively reducing holding company debt, successfully completing a bond consent solicitation and making progress on our U.S. life insurance restructuring plan.[13]

---

[12]     www.sec.gov/Archives/edgar/data/1276520/000119312516564196/d154743dex991.htm.
[13]     *Id.*

68.      On this news, the Company's stock price increased 14%.[14]

69.      For the second quarter, ending June 30, 2016, the Company reported EPS of $0.25 – beating market expectations by $0.04 per share – and revenue of $2.24 billion - beating year over year results by 4.2%. The Company also reported net income of $172 million, or $0.34 per diluted share compared with a net loss of $193 million, or $0.39 per diluted share, in the second quarter of 2015.  Net operating income for the second quarter of 2016 was $123 million, or $0.25 per diluted share, compared with net operating income of $119 million, or $0.24 per diluted share, in the second quarter of 2015.

70.      During the second quarter of 2016, the company completed the sale of its European MI business to AmTrust Financial Services, Inc., which resulted in net proceeds of approximately $50 million to the U.S. MI business.

71.      In the press release announcing the results, McInerney stated:

> Our results in the second quarter were solid, and we were especially pleased with the strong performance in U.S. MI … We also achieved our cash expense reduction target and remain on track to complete the repatriation of our Bermuda subsidiary in the fourth quarter.[15]

72.      Defendant McInerney was very optimistic about the Company's prospects:

> Net income and net operating earnings exceeded our expectations even after a $21 million after-tax charge in the fixed annuity business, where very low interest rates exacerbated by the fallout from Brexit[.][16]

---

[14]      http://seekingalpha.com/news/3177716-genworth-bounces-14-percent-post-earnings. Prior to this release, the Company had missed the mark on several quarters. But as noted by one analyst examining end-of-year and 2015 fourth quarter numbers, there were a number of positive indicators and the Company was impacted largely by its LTC operations. *See e.g., http://researchwiseny.btig.com/ResearchLibraryAnalec/DownloadResearch.aspx?E=ccfdk-b*
[15]      www.sec.gov/Archives/edgar/data/1276520/000119312516668524/d199720dex991.htm.
[16]      http://seekingalpha.com/article/3995265-genworth-financial-gnw-thomas-j-mcinerney-q2-2016-results-earnings-call-transcript?part=single.

73.     Kelly L. Groh, Genworth's Chief Financial Officer and Executive Vice President, reported additional positive financial metrics:

> [O]ur mortgage insurance businesses continue to maintain strong capital positions across all platforms. In U.S. MI we finished the second quarter with PMIERs sufficiency ratio of 115% or in excess of $350 million above the required assets, up from 113% at the end of the first quarter and 109% at the end of 2015. This growth was primarily driven by the increase in market value of U.S. MI's interest in MI Canada, the sale of MI Europe, favorable tax benefits and solid business performance that was offset by incremental new insurance written, or NIW. We will continue to manage our PMIER's compliance with a prudent management buffer. Given U.S. MIs continued strong performance and strengthened balance sheet, we still expect to begin receiving dividends from the business as early as 2017.[17]

74.      Groh summed up the Company's prospects as follows:

> To sum things up, I am pleased with our improved performance across the company and in the quarter along with our improved cash position at the holding company. We still have a long road ahead of us, but we remain focused on the operational progress and strategic actions intended to rebuild shareholder value over time.[18]

## D.     The Preclusive Deal Protection Devices

75.     Despite Genworth's prospects for future profitability and growth and Defendants' ability to command a higher transaction value, Defendants chose to enter into the Merger Agreement with China Oceanwide and agreed to onerous deal provisions and other agreements to ensure and protect a sale only to China Oceanwide.  These onerous and preclusive deal protection devices operate conjunctively to ensure that no competing offers will emerge for the Company.

76.     The Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize stockholder value, including soliciting alternative acquisition proposals or business combinations.

---

[17]     *Id.*
[18]     *Id.*

77.     Specifically, Section 6.2(a) of the Merger Agreement includes a "no solicitation" provision barring the Board and any Company personnel from soliciting, initiating, facilitating or encouraging alternative proposals in an attempt to procure a price in excess of the Merger Consideration.  The Company also must terminate any and all prior or existing discussions with other potential suitors. Section 6.2(f).

78.     Additionally, Sections 6.2(c) and 6.2(d) of the Merger Agreement grants China Oceanwide recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five (5) business days to negotiate with Genworth, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.  Section 6.2(g) requires the Company to notify China Oceanwide within 48 hours that it has received an inquiry, proposal or offer.

79.     To further ensure the success of the Proposed Transaction, the Board locked up the deal by agreeing to pay a termination fee of $105 million. Section 8.5(b). The terms of the Merger Agreement essentially requires that the alternative bidder agree to pay a naked premium for the right to provide Genworth's stockholders with a superior offer.

80.     These provisions cumulatively discourage bidders from making a competing bid for the Company.

## E.      The Incomplete & Materially Misleading Proxy Statement

81.     On December 21, 2016, Genworth filed the Proxy Statement with the SEC in connection with the Proposed Transaction.  The Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and

20(a) of the Exchange Act.  Specifically, the Proxy Statement fails to provide the Company's stockholders with certain material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed by Goldman Sachs and Lazard.  As a result of the incomplete and misleading Proxy Statement, Genworth's stockholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction.**

82.    The Proxy Statement fails to expressly indicate whether or not the standstill provisions contained in the confidentiality agreements entered into with any of the Interested Parties contained a "fall-away" provision that allows each of the Interested Parties to submit a superior proposal to acquire the Company. *See e.g.,* Proxy Statement, 34, 45-46.   Further, it is unclear whether Company A entered into a confidentiality agreement with Genworth and, if so, whether it contained a standstill provision that fell away. Such information is material to Genworth stockholders, as a reasonable shareholder would find it material to know whether or not other parties that expressed a serious interest in acquiring the Company are not foreclosed from submitting superior proposals.  The omission of this information renders the references to the confidentiality agreements in the Proxy and the Board's purported reliance on such agreement and its negotiations with the Interested Parties to recommend the Proposed Transaction incomplete and therefore misleading.

**Materially Incomplete and Misleading Disclosures Concerning Potential Banker Conflicts**

83.    Goldman Sachs and Lazard must disclose whether they, any of their affiliates and/or related entities and/or any individual employees of Goldman Sachs and Lazard that were

members of the team working on the Genworth account (as described in the "Background" section of the Proxy Statement), held and/or owned any type of security interest in Genworth, China Oceanwide and/or Asia Pacific and/or any affiliated entities.

**Materially Incomplete and Misleading Disclosures Concerning Genworth Financial Measures and Bankers' Valuations**

84.     The Proxy Statement provides that the Board reviewed and considered the Certain Genworth Unaudited Financial Projections and also that both Goldman Sachs and Lazard utilized these projections and/or certain line item financial measure in rendering their fairness opinions. Specifically, in reconciling the Non-GAAP projected financial measures with the GAAP financial measures, as expressly required to do under Regulation G (17 C.F.R. §244.100 *et seq.*), Defendants failed to disclose and/or define "accumulated other comprehensive income (loss), which financial measure was expressly used and omitted in calculating and projecting Genworth stockholder equity (Proxy Statement, 91), GAAP return on equity ("ROE"), and non-GAAP Operating ROE. Proxy Statement, 92, notes 3 and 4 respectively.

85.     Further, the Proxy Statement provides a materially incomplete and misleading summary of the key financial analyses Goldman Sachs and Lazard performed in support of their fairness opinions.

86.     The summary of the bases for the Goldman Sachs fairness opinion is provided in the Proxy Statement, pp. 72-78, which summary omits material and critical data, inputs and/or assumptions that the Board was allowed to consider but which Genworth shareholders do not have access to and without which they cannot weigh and value fairness opinion.

87.     Specifically, the Proxy Statement fails to disclose the following information with respect to Goldman Sachs' Present Value of Future Share Price Analysis (Proxy Statement 74-75):

(a)     The projected number of fully diluted outstanding shares of Genworth stock as of December 31 for each of the years 2017 through 2020;

(b)     The accumulated other comprehensive income, referred to as "ex.AOCI" that was expressly omitted from the calculation of book value per share as of June 30, 2016;[19]

(c)     The rationale for utilizing a regression analysis for this valuation methodology, the variable utilized for such analysis and the estimated return on average equity for 2017 for the companies listed on pages 74-75 of the Proxy Statement, as well as the exact manner in which the R-squared value of 0.7959 was determined;

(d)     The basis for utilizing a discount rate of 20.1% and/or clarification of the determination of Genworth's cost of equity.

88.     The Proxy Statement fails to disclose the following information with respect to the Illustrative Sum-of-the-Parts Analysis (Proxy Statement, 75-76):

(a)     The basis for calculating the individual multiples ranges for each of Genworth's business segments;

(b)     The basis for the utilizing the discount rates for each business segment (*i.e.,* the manner for determining the weighted average costs of capital).

89.     Similarly, a summary of the bases for the Lazard fairness opinion is provided in the Proxy Statement, pp. 78-85, which summary omits material and critical data, inputs and/or

---

[19]     Projected Book Value Per Share for 2016 is disclosed (Proxy Statement, 89), but neither the specific ex. AOCI or any specific inputs that make up this income measure, are disclosed.

assumptions that the Board was allowed to consider but which Genworth shareholders do not have access to and without which they cannot weigh and value fairness opinion.

90.     Specifically, the Proxy Statement fails to disclose the following information with respect to Lazard's  Comparable Companies Analysis (Proxy Statement, pp. 80-81):

(a)     The specific P/E multiples (for 2016 and 2017) and the book value multiple for each of the Companies identified on page 81 of the Proxy Statement;[20]

(b)     The rationale for utilizing a regression analysis for this valuation methodology, the variable utilized for such analysis and the estimated return on average equity for 2017 for the companies listed on page 81 of the Proxy Statement, as well as the exact manner and basis for assuming the current discount at which Genworth trades to the regression line (28.4%).

91.     The Proxy Statement fails to disclose the following information with respect to Lazard's Sum-of-the-Parts Analysis (Proxy Statement, 82-83):

(a)     The basis for calculating the individual multiples ranges for each of Genworth's business segments; [21]

(b)     The basis for calculating the range of terminal value multiples;

(c)     The basis for the utilizing the discount rates for each business segment (*i.e.,* the manner for determining the weighted average costs of capital);

---

[20]     The book value measure used by Lazard also excluded Accumulated Other Comprehensive Income. Proxy Statement at 81. Defendants must disclose this measure and if Lazard and Goldman Sachs utilized the same uniform "ex. AOCI" measure.

[21]     The book value measure used by Lazard also excluded Accumulated Other Comprehensive Income. Proxy Statement at 81. Defendants must disclose this measure and if Lazard and Goldman Sachs utilized the same uniform "ex. AOCI" measure.

92.     Finally, Lazard reviewed precedent selected business transactions (Proxy Statement at 80), and on information and belief also reviewed these precedent transactions with the Board, and therefore the Board must disclose the precedent transactions reviewed, even if Lazard did not create a separate formal precedent transaction valuation analysis.

93.     The presentations Goldman Sachs and Lazard made to the Board on information and belief included the specific data, assumptions and inputs described above for each analysis, as banker presentations always include said data and/or information and/or clarification in in order for the Board to review and consider in accepting the bankers' fairness opinions in order to decide whether to approve the Proposed Transaction and recommend it to shareholders in order for the Board to meet its fiduciary duties to shareholders.  Further, the Individual Defendants knew or were negligent and/or reckless in not knowing that the above-referenced material information was omitted from the Proxy Statement, as their fiduciary obligations required them to review the Proxy Statement before it is disseminated to shareholders.  Defendants were therefore at a minimum negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although they could have done so without extraordinary effort.

94.     The omission of the above information renders statements in the Proxy Statement concerning the bases and grounds for the Board's recommendation of the Merger and solicitation of shareholder votes for the Merger (Proxy Statement, 65-72) false and/or materially misleading in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Propose Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange their shares are thus threatened with irreparable harm warranting the injunctive relief sought herein

27

## COUNT I

### On Behalf of Plaintiff for Violations of Sections 14(a) and of the Exchange Act
### Against the Company and the Individual Defendants

95.     Plaintiff repeats and realleges each allegation set forth herein.

96.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Transaction.

97.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

98.     Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

99.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

100.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT II

### Claims for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

101.     Plaintiff repeats and realleges each allegation set forth herein.

102.     The Individual Defendants acted as controlling persons of Genworth within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Genworth, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

103.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

105.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

106.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

107.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

108.    Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in their favor and in favor of the Class and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representatives and his counsel as Class Counsel;

B.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

C.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff  and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: January 23, 2017

Respectfully submitted,

**MEYERGOERGEN PC**

*/s/ Scott A. Simmons*
Scott A. Simmons (VSB 37744)
Christopher J. Habenicht (VSB 15146)
1802 Bayberry Court, Suite 200
Richmond, Virginia 23226
Tel: 804.288.3600
Facsimile: 804.565.1231
simmons@mg-law.com
habenicht@mg-law.com
*Attorneys for Plaintiff*

**OF COUNSEL**

**FARUQI & FARUQI, LLP**
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Ph. (212) 971-1341
Cell (305) 205-8284 or (646) 522-4840
email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*