# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division



ALEXANDER RICE, Individually
And on behalf of all others
Similarly situated, et al.,

      Plaintiffs,

v.                   Civil Action No. 3:17cv59

GENWORTH FINANCIAL INCORPORATED,
et al.

      Defendants.

## MEMORANDUM OPINION

This consolidated securities fraud action is before the Court on two motions seeking appointment as lead plaintiffs and lead counsel under 15 U.S.C. § 78u-4, the Private Securities Litigation Reform Act ("PLSRA"). All of the Plaintiffs in this consolidated action agree that Plaintiffs Alexander Rice and Brian James ought to be appointed as lead plaintiffs and that their counsel should be appointed as lead counsel.[1] The International Union of Operating Engineers Local 478 Pension Fund ("IUOE" or "Union"), which is not a party in this action, and its counsel, seek designation in those capacities, respectively. Having considered both motions, the supporting

---

[1] PLAINTIFFS' MOTION FOR APPOINTMENT OF LEAD PLAINTIFFS AND COUNSEL (ECF No. 39) ("Plaintiffs' Mtn. for Appt.")

and opposing memoranda,[2] and exhibits, the Plaintiffs' motion will be granted and the Union's motion will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are taken from the COMPLAINT (ECF No. 1) filed by Alexander Rice. The facts, as alleged, are recited as they have been pled, and, for now, they are taken as true. The procedural history is reflected as it developed.

Genworth Financial Incorporated ("the Company" or "Genworth") provides consumers with mortgage insurance products that allow people to purchase homes. The Company also offers services ranging from homeownership education and assistance programs to individual and group long-term care insurance products." (Compl. ¶ 36) (ECF No. 1). For several years, the Company's financial circumstances were dire.

"In or around May 2015, the Company received a written proposal to acquire the Company's stock in an all cash transaction at $12.50 per share, a proposal that was later reduced to between $10-11 per share." Id. at ¶ 50. "Other entities also made proposals, including companies A, C and D." Id.

---

[2] MOTION OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 478 PENSION FUND, RICHARD L. SALBERG, AND DAVID PINKOSKI FOR APPOINTMENT AS LEAD PLAINTIFFS AND APPROVAL OF THEIR SELECTION OF CO-LEAD COUNSEL ("Union's Mtn. for Appt.") (ECF No. 37).

On October 21, 2016, a Merger Agreement was executed between Genworth and China Oceanwide. Id. at ¶ 44. On October 23, 2016, Genworth and China Oceanwide issued a press release announcing that the companies had reached an Agreement and Plan of Merger, whereby Genworth would be acquired by China Oceanwide. Id. at ¶ 3. The merger provided that "each issued and outstanding share of Genworth common stock [would] be cancelled and automatically converted into the right to receive $5.43 in cash." Id.

On December 21, 2016, the Company filed a Schedule 14A Preliminary Proxy Statement ("Proxy Statement") with the Securities and Exchange Commission ("SEC"). Id. at ¶ 4. The Proxy statement provided that Genworth stockholders should exchange their shares pursuant to the terms of the Merger Agreement, based, among other things, on the opinion rendered by Genworth's financial advisors, Goldman, Sachs & Co. and Lazard Freres & Cp. LLC. Id. The Proxy statement explained that Genworth began to look to sell the Company because, among other things, it "[s]ens[ed] that cash flow may be impacted, which would negatively impact lucrative equity compensation entitlements . . . ." Id. at ¶ 48. The proposals made by companies A, C and D, described above, were not included in the Proxy Statement.

3

On January 23, 2017, Alexander Rice ("Rice") filed a Class Action Complaint (the "Complaint"), in which he raised claims under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. The Complaint alleges that "[t]he Merger Consideration and the process by which Defendants agreed to consummate the Proposed Transaction are fundamentally unfair to Genworth's public stockholders as the Merger Consideration represents only a 4.2% premium to the Company's closing price of $5.21 on October 21, 2016, the last trading day before the Proposed Transaction was announced." (Compl. ¶ 5). "Despite Genworth's prospects for future profitability and growth and Defendants' ability to command a higher transaction value, Defendants chose to enter into the Merger Agreement with China Oceanwide and agreed to onerous deal provisions and other agreements to ensure and protect a sale only to China Oceanwide." Id. at ¶ 75. The Merger Agreement contains a no shop provision as well as a $105 million termination fee agreement. Id. at 79.

The Complaint filed by Rice alleges several material misrepresentations and omissions in the Proxy Statement provided to Genworth shareholders.[3] In the Complaint, Rice sought

---

[3] "The Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy Statement fails to

4

injunctive relief, certification of a class, and the enjoining of the proposed transaction, "unless and until Defendants disclose the material information identified above which has

---

provide the Company's stockholders with certain material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed by Goldman Sachs and Lazard." (Comp. ¶ 81).

"The Proxy Statement fails to expressly indicate whether or not the standstill provisions contained in the confidentiality agreements entered into with any of the Interested Parties contained a "fall-away" provision that allows each of the Interested Parties to submit a superior proposal to acquire the Company." (Compl. ¶ 82).

"Goldman Sachs and Lazard must disclose whether they, any of their affiliates and/or related entities and/or any individual employees of Goldman Sachs and Lazard that were members of the team working on the Genworth account (as described in the "Background" section of the Proxy Statement), held and/or owned any type of security interest in Genworth, China Oceanwide and/or Asia Pacific and/or any affiliated entities." (Compl. ¶ 83).

"The Proxy Statement provides that the Board reviewed and considered the Certain Genworth Unaudited Financial Projections and also that both Goldman Sachs and Lazard utilized these projections and/or certain line item financial measure in rendering their fairness opinions. Specifically, in reconciling the Non-GAAP projected financial measures with the GAAP financial measures, as expressly required to do under Regulation G (17 C.F.R. §244.100 *et seq.*), Defendants failed to disclose and/or define "accumulated other comprehensive income (loss), which financial measure was expressly used and omitted in calculating and projecting Genworth stockholder equity (Proxy Statement, 91), GAAP return on equity ("ROE"), and non-GAAP Operating ROE. Proxy Statement, 92, notes 3 and 4 respectively." (Compl. ¶ 84). "[T]he Proxy Statement provides a materially incomplete and misleading summary of the key financial analyses Goldman Sachs and Lazard performed in support of their fairness opinions." (Compl. ¶ 85).

been omitted from the Proxy Statement." In the alternative, the Complaint requested recissory damages. (Compl. ¶ C).

On January 25, 2017, the Company filed a Schedule 14A Definitive Proxy Statement with the SEC. This Proxy Statement recommended that shareholders vote in favor of the Proposed Transaction and announced that the special shareholder meeting to vote on the Proposed Transaction would occur on March 7, 2017.

On January 25, 2017, Brian James ("James") filed a Class Action Complaint for Violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, in which he raised essentially the same substantive claims as those raised by Rice. Rice and James agreed to work together to coordinate their actions. Also on January 25, 2017, the Rosenfeld Family Trust filed a Class Action Complaint in the United States District Court for the District of Delaware, in which it raised substantively similar claims to those raised by Plaintiffs Rice and James.[4] On February 2, 2017, Rice, supported by James, filed

_____

[4] On February 10, 2017, two weeks after filing its complaint on January 25, 2017, the Rosenfeld Family Trust filed motions, in the Delaware proceeding, for expedited proceedings and a preliminary injunction seeking to enjoin the March 7, 2017 Genworth stockholder vote. In response, on February 13, 2017, the Delaware Court ordered an accelerated briefing schedule and set a February 24 hearing date on the motion.

On February 14, 2017, Defendants filed a motion to vacate the Delaware Court's February 13 Order on the grounds that, when

PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 2), which sought to enjoin the shareholder vote on the Proposed Transaction until certain supplemental disclosures were made to Genworth's stockholders.

On February 6, 2017, Esther Chopp ("Chopp") filed a Class Action Complaint in the United States District Court for the District of Delaware. Chopp raised essentially the same substantive claims as raised by Rice and James. See Chopp v. Genworth Financial, Inc., et al., No. 3:17-cv-00157-REP (D. Del.).

On February 10, 2017, David Ratliff filed in the United States District Court for the Eastern District of Virginia a complaint in which he raised substantively identical claims to those already raised by Rice, James, and the Rosenfeld Family Trust. The Ratliff case was filed and identified as a case related to the Rice case.

On February 17, 2017, an Emergency Motion to Consolidate Cases and for Appointment of Interim Lead Counsel was filed, in which Rice and James sought the entry of an order consolidating

the Rosenfeld Family Trust requested expedited relief, it failed to inform the Delaware Court about the existence of the earlier-filed Virginia Actions. The Delaware Court granted Defendants' motion and vacated the February 13 Order. Thereafter, on February 14 and February 15, 2017, Defendants filed motions to transfer each of the Delaware Actions to this Court or, in the alternative, to stay them pending resolution of the Virginia Actions.

the actions pending before this Court, and appointing Faruqi &
Faruqi, LLP, Monteverde & Associates, PC, and Kahn Swick & Foti,
LLC ("KSF") as Interim Class Counsel and MeyerGoergen PC as
Interim Lead Liaison Counsel. (ECF No. 22). The Court
determined that "all three actions [Rice, James & Ratliff] shall
be consolidated and the caption of the consolidated case shall
be Rice v. Genworth Financial Incorporated, et al., Civil Action
No. 3:17cv59." (ECF No. 30). On February 23, 2017, the Court
consolidated Rosenfeld Family Trust v. Genworth Financial, Inc.,
et al., No. 3:17cv156, and Chopp v. Genworth Financial, Inc., et
al., No. 3:17cv157 with the consolidated cases, all of which
thereafter proceeded under the style Rice, et al. v Genworth
Financial, Inc., et al., No. 3:17cv59.

The Plaintiffs subsequently reached an agreement with the
Defendants, pursuant to which the Motion for a Preliminary
Injunction was withdrawn. Also, the parties in this
consolidated action advised "that it is their intent that
following [Defendant's] disclosures called for in Court Exhibit
1, these consolidated actions will be settled in their entirety
and, to that end, counsel intend to prepare a Memorandum of
Understanding reflecting the settlement (including releases);
and, to that end, counsel shall prepare a schedule of further
proceedings respecting class certification and appointment of

counsel all of which shall comply with the timing requirements of the Private Securities Litigation Reform Act." (ECF No. 30).

On March 6, 2016, the Court entered the STIPULATED PSLRA LEAD PLAINTIFF SCHEDULING ORDER. (ECF No. 35). It provided that: "[p]ursuant to 15 U.S.C. § 78u-4(a)(3)(A), on or before April 17, 2017, any plaintiff in these actions or any other member of the purported class who wishes to serve as lead plaintiff in this consolidated purported class action shall file a motion to serve as lead plaintiff of the purported class and shall state its selection for lead counsel to represent the purported class, subject to approval by the Court."

On April 1, 2017, the Union filed its motion seeking to be named lead plaintiff and seeking approval of the Union's counsel as lead counsel. (ECF No. 37). Rice and James, with the consent of the other plaintiffs in the consolidated cases, also filed the PLAINTIFFS' MOTION FOR APPOINTMENT OF LEAD PLAINTIFFS AND COUNSEL. (ECF No. 39).

The Union also has a shareholder derivative action pending in the Delaware Court of Chancery, Genworth Financial, Inc. Consolidated Derivative Litigation, C.A. No. 11901-VCS (the "Delaware State Case"). In that case, the defendants have moved for dismissal and the motion has been heard. However, the Judge in the Delaware State Case explained that "any ruling on a motion to dismiss in the pending derivative case would be

9

advisory in light of the fact that the pending merger was going to extinguish the rights of Shareholders to pursue a derivative claim and so he requested that the parties consult with one another as to whether, in the parties' views, the Court should issue its motion-to-dismiss decision, and, subsequently, the parties informed the Court that it was [their] view the Court should not issue its motion-to-dismiss decision." Additionally, the Union is pursing inspection requests pursuant to 8 DEL. C. §220. Salberg v. Genworth Financial, Inc., C.A. No. 2017-0018-JRS (Del. Ch.).

The stockholder vote has taken place and the merger was approved; however, the merger of Genworth and China Oceanwide has been pending for several months. Recently, a further delay in the merger was announced.[5]

## POSITIONS OF PARTIES

Pursuant to the PSLRA, the Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(i). To that end, explains the Union, the Court

---

[5] See China Oceanwide's $2.7bn acquisition of Genworth faces regulatory delay, IBR Life Insurance & Pensions, http://lifeinsuranceandpensions.insurance-business-review.com/news/china-oceanwides-27bn-acquisition-of-genworth-faces-regulatory-delay-170717-5872025 (July 17, 2017).

10

is required to determine which potential lead plaintiff has the "largest financial interest" in the relief sought by the Class and whether that plaintiff is a typical and adequate class representative under Rule 23 of the Federal Rules of Civil Procedure. The Union argues that, of the shareholders involved in these motions, it has the largest financial interest, and that, therefore, there is a presumption that it should be the lead plaintiff.[6] And, the Union contends that it satisfies the requirements of Rule 23.

Rice and James concede that, of the shareholders involved in these motions, the Union has the largest financial interest in Genworth. Although Rice and James acknowledge that, under the PSLRA, the Union is deemed the presumptive lead plaintiff, they take the view that the Union cannot adequately represent the class based "on the conflict the [Union] has due to its simultaneous prosecution of derivative claims for Genworth and based on its failure to pursue shareholder direct claims as the Rice Group has." (ECF No. 50). In particular, Rice and James maintain that the Union's derivative claim against Genworth in Delaware presents a conflict of interest and subjects the Union to unique defenses, thereby rendering the Union an inadequate lead plaintiff.

---

[6] At all relevant times, the Union held 39,153 shares of Genworth stock.

11

Rice and James further explain that the conflict will continue even after the merger is completed (if it is completed). "There are other scenarios where the derivative case goes on for years, keeping the IUOE Investor Group in a conflicted position. For example, the approval of the Merger could be delayed for over a year, or new evidence could trigger an exception to the mootness rule and the derivative claims could go on after approval of the Merger . . . ." Id.

In response, the Union argues that there is no conflict because this action and the derivate action in Delaware are related. "In the Derivative Action, the IUOE Investor Group alleges that certain Genworth Financial, Inc. [] executives and directors breached their fiduciary duties by allowing Genworth to engage in securities fraud . . . [and here] the Rice Group is alleging, *inter alia*, that defendants failed to properly value the derivative claims asserted by the IUOE Investor Group and disclose all material information regarding those claims." Id. Finally, says the Union, "[g]iven the Rice Group's apparent intent to recover only non-monetary relief for the putative class, it is not in a position to claim that appointment of the IUOE Investor Group, a group that plans to pursue money damages against Defendants, will disadvantage the class economically." Id.

12

In response to the Court's inquiry, all parties agree that the case is not moot, notwithstanding the settlement of the preliminary injunction aspect of the case and the amended disclosures made by the Company pursuant to the settlement. Rice and James argue that the existence of a settlement does not divest the Court's jurisdiction over the case, but does have a bearing on the lead plaintiff analysis.

On July 5, 2017, at the hearing on the lead plaintiff/lead counsel motions, the Company weighed in on that issue by arguing that there was no merit to the securities claims that the Union says it would raise if it were appointed lead counsel. The Court gave the parties an opportunity to brief that argument. The Union responded that the Company had no right to argue a position on the lead plaintiff motions. Rice and James essentially adopted the argument advanced by the Company.

## ANALYSIS AND APPLICATION OF LAW

### I.    Jurisdiction

"Although neither party has affirmatively argued that the case is moot, resolution of that question is nonetheless essential because, if the case is moot, the Court lacks jurisdiction to proceed further and any opinion would be advisory and thus improper." North Carolina v. Rice, 404 U.S. 244, 246 (1971). Therefore, "a suit must be definite and

13

concrete, touching the legal relations of parties having adverse legal interests . . . However, moot questions require no answer." Id. (internal citations omitted). But, if "the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." Chafin v. Chafin, 568 U.S. 165, 133 (2013).

The inquiry to be made here is much like the one presented in Lambert v. Tellabs, Inc., No. 13-cv-07945, 2015 U.S. Dist. LEXIS 156284, at *6 (N.D. Ill. Mar. 5, 2015). In Lambert, the shareholders alleged that the company's "disclosures asking shareholders to approve the merger omitted critical information in violation of § 14(a) of the Securities Exchange Act." Id. The shareholders sought "primarily injunctive relief to prevent the merger, but also sought damages in the alternative if the merger were finalized." Id. at 3. The parties negotiated a Memorandum of Understanding, whereby the company "agreed to send out supplemental disclosures to shareholder and thereby cure the alleged defects in their prior disclosures." Id. The district court found "the supplemental disclosures d[id] not render the Plaintiff's disclosure-related claims moot because they addressed only seven of the eleven omissions Plaintiff alleged in her complaint." Id. at 6. Additionally, the court found that, because the complaint sought "not only an injunction to prevent the merger, but also damages if the merger did go

14

through," if the court were to reject the settlement agreement, the shareholders could continue with the litigation on the merits in order to seek damages. The district court explained that, "[w]hile injunctive relief is typically the preferred method for remedying disclosure violations . . . damages are available for such violations where the merger has already been consummated." Id. For those reasons, the case in Lambert was not moot.

Here, as in Lambert, the parties advised that it was their intent to prepare a Memorandum of Understanding reflecting the settlement, whereby certain supplemental disclosures were to be made. The parties here also agreed that the Company would provide certain discovery that would permit verification that the disclosures, as supplemented, were accurate and complete. If the plaintiffs are not satisfied on that point, they can proceed with the litigation including, inter alia, the pursuit of the claim for rescissory damages. And, of course, it is possible that the Court would not approve the settlement and thereupon the case would continue.

Considering the facts in this record, the Court concludes that the case is not moot and that the Court retains jurisdiction over the case. Thus, it is appropriate now to consider the motions respecting the designation of lead plaintiff and lead counsel.

## II. **Presumptive Lead Plaintiff**

"[T]he PSLRA provides a sequential procedure for litigants and the district court to follow in determining who among the members of the alleged class is the 'most adequate plaintiff' to serve as the lead plaintiff for the consolidated class action. The PSLRA also provides certain specific requirements that a candidate must meet to be named lead plaintiff." In re MicroStrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 432 (E.D. Va. 2000).

> First, a complaint is not complete unless the named plaintiff includes a sworn certification setting forth certain facts designed to assure a court that the named plaintiff (i) has suffered more than a nominal loss, (ii) is not a professional litigant, and (iii) is otherwise interested and able to serve as a class representative. [] Second, the first plaintiff to file a class action securities fraud complaint must publish notice of the complaint "in a widely circulated national business-oriented publication" within twenty days of filing the complaint. 15 U.S.C. § 78u-4(a)(3)(A)(i). That notice must (i) include a description of the claim and the class period, and (ii) inform other members of the alleged class that they may move, within sixty days of the notice, to be named lead plaintiff, whether or not they have filed their own complaint.

Id. There is no dispute that all of the prerequisites have been met in this case.

Pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(i), "[n]ot later than 90 days after the date on which a notice is published under

subparagraph (A)(i), the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") . . . ." On March 6, 2017, the Court ordered the parties to file their Lead Plaintiff Notice in compliance with the PSLRA. See (ECF No. 35). Thereafter, the pending motions were filed.

## A. There Is A Rebuttable Presumption That The Union Should Be The Lead Plaintiff

> The statute creates a rebuttable presumption that the most adequate plaintiff is the 'person or group of persons' who (i) 'has either filed the complaint or made a motion in response to [notice given],' 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa), (ii) 'has the largest financial interest in the relief sought by the class,' 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb) and (iii) 'otherwise satisfies the requirements of [Rule 23, Fed. R. Civ. P.],' 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc).

In re MicroStrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 433 (E.D. Va. 2000). The Union has neither filed a complaint nor moved for leave to intervene, but it has moved to be appointed as lead plaintiff pursuant to Section 21D(a)(3)(B) of the Exchange Act. And, it is eligible to be considered for

17

appointment as lead plaintiff pursuant to the requirements set forth under the PSLRA.

### 1. The Union Has The Largest Financial Stake In The Litigation

The IUOE holds 39,153 shares of Genworth common stock. Rice and James concede that, of the shareholders involved in these motions, the IUOE holds the largest financial interest in the litigation. Rice and James collectively own 17,223 shares of Genworth stock. Rice owns 100 shares. James owns 17,123 shares.[7]

### 2. The Rule 23 Requirement For Typicality And Adequacy To Prosecute The Action As Applicable At This Stage Of The Proceedings

"Even if a candidate has the largest financial interest in a case, it is not the presumptive Lead Plaintiff unless it 'otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.' 15 U.S.C. § 78u 4(a)(3)(B)(iii)(I)(cc)." Switzenbaum v. Orbital Scis. Corp., 187 F.R.D. 246, 250 (E.D. Va. 1999). At this stage of the litigation, the Rule 23 "inquiry is not as searching as the one

---

[7] None of the other plaintiffs have moved for appointment as lead plaintiff. Further, the other plaintiffs own fewer shares than the movants Rice and James. "Plaintiff Ratliff holds just 375 shares of Genworth commons stock – barely 2% of the holdings of Movants – and the plaintiffs in the Delaware Actions hold only 200 and 300 shares, respectively – less than 3% of the holdings of Movants." (ECF No. 40).

triggered by a motion for class certification . . . the candidate must make at least a preliminary showing that it has claims which are typical of those of the putative class and that it has the capacity to provide adequate representation for others." Id.; see also In re Cavanaugh, 306 F.3d 726, 730 (9th Cir. 2002) (the court "must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a)").

Originally, Rice and James did not challenge the Union's position on typicality and the capacity for adequate representation at this stage of the litigation.[8] However, at the hearing, counsel for the Company argued as follows:

> The Union are the wrong people to bring the 14(a) claim because either the "union voted for the deal, knowing everything there was to know about the derivative claim, in which event I don't see how they could possibly pursue a fraud claim, or they voted against the deal in which event I don't understand how they can represent a class of people who didn't vote against it because they're not similarly situated. In fact, they're completely different from everyone else."

<hr>

[8] See ("Rice Group Memorandum of Law In Opposition")(ECF No. 50) ("It appears that IUOE Investor Group has the largest financial interest, and by operation of law, gains a presumption of being the most adequate Lead Plaintiff under the PSLRA and Fed. R. Civ. P. 23. However, once a plaintiff is deemed the presumptive lead, "competing plaintiffs have the opportunity to rebut the presumptive lead plaintiff's showing of typicality and adequacy.").

19

(ECF No. 68, #1892).  After the hearing on the motions, Rice and James challenged the Union's adequacy based on the Union's knowledge of the derivative action at the time of the shareholder vote on the merger.  As Rice and James put it:

> In this case, it appears that the IUOE Investor Group seeks damages not because it casted an uninformed vote, but instead because the vote did not go the way it wanted.  This is no basis for a Section 14(a) claim, and is an audacious position for a party that sat idly by with superior knowledge of the value of the derivative claims and did not challenge the sufficiency of the disclosures to protect the class before (or after) the vote.

See (ECF No. 73).[9]

The Court agrees with the Union that the Company cannot be the party to contest whether the Union can rebut the presumption of the Union's adequacy.  Under the PSLRA, that prerogative lies with "*a member* of the purported plaintiff class" can offer evidence rebutting the lead plaintiff presumption.  See Kiken v. Lumber Liquidators Holdings, Inc., No. 4:13cv157, 2014 WL 12588686, at *2 (E.D. Va. May 14, 2014) ("After Moving Plaintiffs successfully raise the rebuttable presumption of adequacy, the presumption cannot be rebutted by Defendants.").

---

[9] MEMORANDUM OF LAW IN RESPONSE TO IUOE INVESTOR GROUP'S SUPPLEMENTALMEMORANDUM ADDRESSING DEFENDANTS' OPPOSITION TO APPOINTMENT ("Rice Group's Supp. Mem. Def's Opp.").

However, the argument raised by the Company, and subsequently adopted by Rice and James, is applicable to the relaxed Rule 23 analysis and the Company is entitled to weigh in on that issue. Therefore, "[t]he Court will consider the argument by the [Company] that the [Union] do[es] not . . . satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." Kiken v. Lumber Liquidators Holdings, Inc., No. 4:13CV157, 2014 WL 12588686, at *3 (E.D. Va. May 14, 2014).

As explained earlier, "[a] wide ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for the Court's later consideration of a motion for class certification." In re Milestone Scientific Sec. Litig., In re USEC Sec. Litig., 168 F. Supp. 2d 560, 566 (D. Md. 2001). Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed R. Civ. P. 23(a)(3). While the claims of the named plaintiff should be the same or similar to the class claims, they need not be identical. Gruber v. Price Waterhouse, 117 F.R.D. 75, 79 (E.D. Pa. 1987).

The Union argues that, without regard to its specific knowledge or votes, it has standing to pursue the § 14(a) claims because "[it was] harmed when Defendants issued a misleading proxy that caused Genworth shareholders to approve a merger for $2.7 billion when the truth was that Genworth was worth at least

21

$2.939 billion." (ECF No. 70). In Hershfang v. Knotter, 562 F. Supp. 393, 397 (E.D. Va. 1983), aff'd, 725 F.2d 675 (4th Cir. 1984), the defendant argued that the "uncontroverted facts establish plaintiff did not rely on the proxy materials in deciding how to vote" and voted against the transaction. However, the Court found that the plaintiff had standing to pursue the securities claim "because such a claim employs a different standard of causation from that applied in a Rule 10b-5 claim. A Rule 14a-9 claim requires only a showing of 'transactional causation': that the *proxy solicitation itself*, not the alleged defect in the solicitation, was an essential link in the transaction. *See, e.g., Mills v. Electric Auto-Lite Co.,* 396 U.S. at 385, 90 S.Ct. at 622." Id. at 398 (emphasis added). Therefore, in proxy disclosures cases "there can be no doubt that the transaction required shareholder approval which, in turn, required the proxy solicitation. Thus transactional causation existed regardless of whether plaintiff relied on the proxy materials." Id.

The same is true in this case. Whether the Union relied on the proxy statement in making its vote,[10] the proxy itself is the basis for the 14(a) claim, thus the Union has standing to pursue

---

[10] The Union has not disclosed whether or not it voted to approve the merger.

the claim. And, on that point (typicality), the Union satisfies the Rule 23 inquiry at this stage. See In re Cavanaugh, 306 F.3d 726, 730-31 (9th Cir. 2002) ("At step two of the process, when the district court makes its initial determination, it must rely on the presumptive lead plaintiff's complaint and sworn certification; there is no adversary process to test the substance of those claims.").[11]

### B. Rice And James Have Rebutted The Presumption that the Union Is The Presumptive Adequate Lead Plaintiff

"The above presumption [insofar of the entity with the largest financial interest] may only be rebutted by proof that the presumptive lead plaintiff (1) will not fairly and adequately protect the interests of the class or (2) is subject to 'unique defenses' that render such plaintiff incapable of adequately representing the class. Id. § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb)." In re Cable & Wireless, PLC Sec. Litig., 217 F.R.D. 372, 375 (E.D. Va. 2003). To demonstrate

---

[11] No one seems to challenge the Union's position that it has the capacity to provide adequate representation for the class. At this stage, adequacy equates to capability. But, if adequacy were to include an analysis similar to the conflicts issue raised by Rice and James (and discussed below), the adequacy issue could not be resolved in the Union's favor. Rice and James allude to that point, but it is really a matter to be dealt with in assessing the alleged conflict. Nonetheless, because, as discussed below, the Union has serious conflicts, the Union would not meet the adequacy requirement if that requirement were to be assessed beyond the surface question of capability.

that the lead plaintiff will be inadequate, courts require a showing of "specific support in evidence of the existence of an actual or potential conflict of interest." Constance Sczesny Trust v. KPMG LLP, 223 F.R.D. 319, 324-25 (S.D.N.Y. 2004); see e.g., Sofran v. LaBranche & Co., Inc., 220 F.R.D. 398, 403-04 (S.D.N.Y. 2004) (emphasizing that the PSLRA requires proof of inadequacy and not merely speculation).

Rice and James argue that the Union has a conflict of interest in representing the class. Therefore, Rice and James contend that the Union cannot fairly and adequately represent the class. See Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) (internal citations omitted) ("For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental."). Rice and James also argue that the Union is subject to unique defenses that render it an unsuitable lead plaintiff.

### 1. The Union's Potential Conflicts And The Unique Defenses Issue

To rebut the presumption that the Union is not an adequate lead plaintiff, Rice and James contend that the Union has a conflict of interest in this action against the Company because it is pursuing, on behalf of the Company, a derivative action in the Delaware Court of Chancery. In analyzing the alleged conflicts of interest, the Court considers that "[a] conflict is

24

not fundamental when [] all class members share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants]. Moreover, a conflict will not defeat the adequacy requirement if it is merely speculative or hypothetical." Ward v. Dixie Nat. Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) (internal quotations omitted).

Rice and James assert the following conflicts based on the Union's prosecution of the derivative action:

- The derivative case filed by the Union seeks monetary damages from some of the same corporate and individual defendants in this case – but not all of them. It also seeks monetary damages from related individual defendants not named in this case

- The derivative case filed by the Union asserts "related" but different claims against the same corporate and individual defendants in this case but not all of them. It also asserts "related" but different claims against individual defendants not named in this case

- The Union seeks to represent two overlapping but different classes without benefit of a waiver from the mutual members of both classes

- The Union would be conflicted as to the management of the two cases. They are at different stages – the derivative action is subject to a pending motion to dismiss and this action has been referred to settlement negotiations, which are in progress. The fact that the Union is concerned that any potential settlement reached in this case may adversely impact them is *prima facie* proof that they have a conflict of interest with the putative class in this case

- The Union would be estopped or precluded from <u>disputing director and manager liability</u> of overlapping claims, for its different set of defendants, thus reducing the recovery available to the class in this case from the defendants that are named

- The apparently sizeable body of <u>confidential information</u> produced under different circumstances from different parties will cause the Union to be the subject of unique defenses and additional motion practice

- As plaintiffs in a derivative action, the Union has a right to seek documents that are subject to the <u>attorney client privilege</u> to the extent the privilege is owned by the corporation. If the Union already possesses such documents, it will be conflicted in this case. If not, and it becomes Lead Plaintiff in this case, it will be conflicted in representing the corporation and seeking such documents in the derivative case

The Fourth Circuit has not determined whether a plaintiff pursuing a derivative action on behalf of a corporation in one case is per se conflicted when also pursuing a direct action against the corporation in a separate case as lead plaintiff under the PSLRA. But, on that point, the Court finds the decision in <u>Koenig v. Benson</u>, 117 F.R.D. 330, 333 (E.D.N.Y. 1987) instructive. In <u>Koenig</u>, the defendant objected to class certification based on the "alleged atypicality and inadequacy of the representatives." The basis for that objection was that the class representative and counsel are "presently bringing a derivative suit against [the Defendant in a state court] and this commitment creates a conflict of interest in representing a

26

class in this litigation." Id. at 334. "Defendants contend that this disqualifies [the plaintiff] as an adequate class representative under Rule 23(a)(4), because his commitments to the derivative suit shows an interest contradictory to that of the class he seeks to represent." Id. In response, the class representative argued "that this conflict is more theoretical than real, and it should not affect class certification at this time, because the class representatives can always be decertified later if a true conflict prejudices the class members." Id. The Court found that there was a disqualifying conflict, explaining that:

> When a plaintiff brings a derivative suit seeking recovery for the corporation and simultaneously files a class suit for damages against that same corporation, there is an inherent conflict. One court has written, "it is difficult to understand how an attorney can properly represent the interests of a corporation and its present shareholders in a derivative action brought on their behalf, and, at one and the same time, properly represent its present and/or former shareholders in a class action against the corporation without compromising the independence of professional judgment and loyalty to these two groups of clients with potentially conflicting interests." Stull v. Baker, 410 F.Supp. 1326, 1336-37 (S.D.N.Y. 1976).

Id; see also Tuscano v. Tuscano, 403 F. Supp. 2d 214, 223 (E.D.N.Y. 2005)("Any individual claims raised by a shareholder

27

in a derivative action present an impermissible conflict of interest).[12]

Other courts have disagreed with a per se approach. Koenig, 117 F.R.D. at 334 (collecting cases). Those decisions teach that a case by case approach is the necessary analytical construct. That is because, even if the existence of simultaneous direct and a derivative actions are not viewed as a per se conflict, "a particular case may give rise to a potential conflict for someone serving as a class representative and a derivative plaintiff at the same time. Therefore the Court must consider these potential conflicts and deal with them as appropriate." Id. Thus, it is necessary to consider the facts of the case to determine whether a conflict of interest does in fact exist and whether, if so, the conflict is sufficient to rebut the presumption that the Union is an adequate lead plaintiff.

---

[12] Other decisions deliver the same message. See e.g., Wood v. Rex-Noreco, Inc., 61 F.R.D. 669, 674 (S.D.N.Y. 1973); Hawk Industries, Inc. v. Bausch & Lomb, Inc., 59 F.R.D. 619, 624 (S.D.N.Y. 1973); Ruggiero v. American Bioculture, Inc., 567 F.R.D. 93, 95 (S.D.N.Y. 1972).

### (i) There Is A Conflict Between The Derivative Class And The Direct Action Class Because Of the Limited Funds Of The Corporation

The Court is persuaded by the argument made by Rice and James that there is a conflict between the direct action here and the derivative action in Delaware based on the issue of damages. Their argument is that:

> [O]n one hand this direct class action seeks recovery *from* the corporation in the form of rescissory damages, attorneys' fees and other costs. The Derivative Action maintained by members of the [Union] also seeks recovery *for* the corporation of damages from director defendants, but also recovery or attorneys' fees, accountants' and experts' fees, costs, and expenses for which the corporation itself may be liable.

("Mem. Opp. to IUOE") (ECF No. 50) (internal citations omitted). And, that argument is indeed correct in this case.

The Union tries to rebut this conflict not by denying its existence, but by explaining that, once the merger is consummated, the derivative action will disappear. Although it is true that derivative actions can often become direct actions post-merger, see In Lewis v. Anderson, 477 A.2d 1040 (Del. 1984) ("the Delaware Supreme Court held that the right to bring a derivative action passes via merger to the surviving corporation"), the Union provides no authority to support a finding that the Court should appoint a lead plaintiff based on a possible outcome of a pending merger. And, this Court located

29

no such authority. The PSLRA provides strict timing requirements for the appointment of lead plaintiff, thus postponing the lead plaintiff appointment till the consummation of the merger would be in contradiction to the overall purpose of the statute.

The Union clearly stated in oral argument that "most of the time when there's a lead plaintiff appointed, that's not the original plaintiff, and the merger is not -- does not have a set date yet, commonly what the parties stipulate to and the court orders is that the amended complaint be filed after the merger certain set days." (ECF No. 68). That proposed procedural scenario is troubling because this merger has been pending for several months, and recently another delay has been announced. Thus, it is unclear when, or if, a merger will be consummated. This action cannot sit on hold on the speculation that an already long-delayed merger may ultimately come to fruition or on the possibility that the Union will file an amended complaint that eliminates the present conflict.

The Court also finds persuasive the argument of Rice and James that the Union's 220 Action potentially serves as a basis to strengthen the Union's derivative case post-merger.[13] See

_____

[13] On this point, Rice and James contend: "the [Union] is also pursuing the Section 220 Action in the Delaware Court of Chancery. As part of its demand in that case, the IUOE Investor

30

Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp., 75 A.3d 888, 894 (Del. 2013) ("[T]his Court recognized two exceptions to the loss-of-standing rule. The first is where the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of their standing to bring or maintain a derivative action.").

The Court cannot assess the adequacy of a lead plaintiff based on possible future events. The merger has not yet been consummated and the Court must analyze the conflict as it exists today. As of now, the derivative action is still pending and so too is the merger. Given the nature of the claims here and in the derivative action, there is a conflict. Furthermore, as Rice and James argue, the derivative action can continue post-merger. While the Court cannot now determine whether the derivative action here will succeed on that front, the conflict certainly is not speculative. On this record at this time, it is clear that the possibility of monetary recovery to the

Group is seeking certain documents and records of Genworth 'to determine, in light of the claims in the Derivative Action, whether the members of the Board pursued and authorized the Acquisition as a means to eliminate potential personal liability for claims in the Derivative Action.' 220 Complaint at ¶ 16(b). In other words, the [Union] is seeking evidence that would be grounds to continue to pursue the Derivative Action even if the Merger is consummated, under the fraud exception to the loss-of-standing rule." ("Supp. Mem. Conflict of Interest") (ECF No. 59). At this stage of the proceedings, that contention is correct.

31

corporation in the derivative action is in direct contradiction to the class action here. Although it is possible, indeed likely, that this action will end in settlement, that is still not a certainty, and, in any event, the class plaintiffs here could seek rescissory damages under § 14(a). This conflict renders the Union an inadequate lead plaintiff. In other words, here, as in Koening, Tuscano, Wood, Hawk, and Ruggiero, the objectives of the derivative action are at odds with the objectives in this action. Where that is so, there is a conflict that precludes the relief sought by the Union.

### (ii) There Is A Conflict Between The Derivative Class And The Direct Action Class Because Of The Different Legal Claims And Different Named Defendants In Each Case

The derivative action in Delaware alleges the breach of fiduciary duties on the part of nine directors and three executives. However, this class action "only involves a single schedule 14A Preliminary Proxy Statement and names *ten director defendants, two of which are not named in the derivative action, and no executives*." ("Mem. Opp. to IUOE")( (ECF No. 50) (emphasis added). As argued by Rice and James, these differences are significant because the PSLRA "reduces the liability for an individual defendant based on that defendant's percentage of fault compared to all parties that are arguably liable, whether or not named in the lawsuit." Id. However,

32

"[t]he [Union] would be estopped from disputing director and manager liability of overlapping claims, for its different set of defendants, thus reducing the recovery available to the class in this case from the defendants that are named." Id. This too is a sufficient conflict to rebut the presumption that the Union is an adequate lead plaintiff.

On this record, the Court finds that the Union's conflicts are sufficient to rebut the lead plaintiff presumption.

## II. Lead Plaintiff & Lead Counsel

It now is necessary to consider whether the movants (Rice and James) should be appointed as lead plaintiffs under the PSLRA. "Plaintiff Rice held and continues to hold 100 shares of Genworth common stock and Plaintiff James held and continues to hold at least 17,123 shares of Genworth common stock." ("Mem. Law Support Lead Plnt.")(ECF No. 40). The movants, of the shareholders involved in these motions, therefore hold the second largest financial interest in the Company and thus are presumed to be the most adequate lead plaintiff.[14] Further, in

---

[14] Rice and James are moving for the appointment of lead plaintiff jointly. Early on in the litigation, the plaintiffs agreed to work together. "A group consisting of persons that have no pre-litigation relationship may be acceptable as lead plaintiff candidate so long as the group is relatively small . . . and therefore presumptively cohesive." Simmons v. Spencer, 2014 WL 1678987, at *5 (S.D.N.Y. Apr. 25, 2014). While the decision to appoint aggregate lead plaintiffs may implicate PSLRA concerns as to lawyers directing the course of litigation, the Court finds that the problem is not applicable here. James holds the most shares, excluding the Union, with or without the aggregation of Rice's shares. The choice by Rice and James to

all respects, Rice and James have shown that they meet the relaxed typicality and adequacy (capability) requirements of Rule 23 that apply at this stage of the proceedings.

The lead plaintiff is empowered under the PSLRA to select and retain counsel to represent the class members in the consolidated actions. See 15 U.S.C. § 78u-4(a)(3)(B)(v). The Court finds that Faruqi & Faruqi, LLP (the "Faruqi Firm") and Kahn Swick & Foti, LLC ("KSF") as Co-Lead Counsel and MeyerGoergen PC ("MeyerGoergen") as Liaison Counsel possess the requisite experience to represent the interests of the class members and approves the selection of those firms as co-lead counsel and liaison counsel respectively.

The Court notes that the current case is a situation where the appointment of more than one plaintiff is appropriate. "[T]he statute allows the lead plaintiff to be a 'person or group of persons' or class 'member or group of members,' 15 U.S.C. § 78u-4(a)(3)(B)(i), (iii)(I) . . . ." In re Cree, Inc., Sec. Litig., 219 F.R.D. 369, 372 (M.D.N.C. 2003). Rice and James have effectively worked together since the beginning of this litigation.

"There is, however, some question whether two law firms should be allowed to serve as co-lead counsel." In re

work together since the inception of the litigation was based on the parties' mutual shared interests.

MicroStrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 440 (E.D. Va. 2000). "[T]he statute does not explicitly restrict lead counsel to one law firm, and there may be instances in which a class is well-served by having two or more law firms combine to direct the litigation. Other courts have held that multiple law firms could share lead counsel duties so long as those firms provided assurance that they would work together efficiently and without duplication of services." Id. (internal citations omitted). Here, co-counsel have worked together efficiently. It is clear from the parties' papers, that the legal theories presented by Rice and James are identical. Thus, the appointment of lead plaintiffs with co-lead counsel is appropriate. However, counsel are admonished that any future application for legal fees must show that there is no overlap of legal work and that counsel have efficiently allocated responsibilities so as to confine attorneys' fees to those that are reasonable in amount and necessarily incurred.

## CONCLUSION

For the foregoing reasons, the MOTION OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL NO. 478 PENSION FUND, RICHARD L. SALBERG, AND DAVID PINKOSKI FOR APPOINTMENT AS LEAD PLAINTIFFS AND APPROVAL OF THEIR SELECTION OF CO-LEAD COUNSEL (ECF No. 37) will be denied and PLAINTIFFS' MOTION FOR

APPOINTMENT OF LEAD PLAINTIFFS AND COUNSEL (ECF No. 39) will be granted.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 25, 2017