# EXHIBIT 2

EFiled:  Sep 28 2011  4:45PM EDT
Transaction ID 40078891
Case No. 5821-VCL

IN THE COURT OF CHANCERY OF THE STATE OF DELAWAR

THOMAS TURBERG, On Behalf of      :
himself and All Others            :
Similarly Situated,               :
                                  :
                 Plaintiff,       :
                                  :
         vs.                      :     Civil Action
                                  :     No. 5821-VCL
ARCSIGHT, INC., THOMAS J.         :
REILLY, SANDRA BERGERON,          :
WILLIAM P. CROWELL, E. STANTON    :
McKEE, JR., CRAIG RAMSEY,         :
SCOTT A. RYLES, TED SCHLEIN,      :
ROGER SIBONI, ERNEST VON          :
SIMSON, HEWLETT-PACKARD           :
COMPANY, and PRIAM                :
ACQUISITIION CORPORATION,         :
                                  :
                 Defendants.      :


                       - - -


                    Chancery Courtroom No. 12C
                    New Castle County Courthouse
                    Wilmington, Delaware
                    Tuesday, September 20, 2011
                    9:58 a.m.


BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor.


                       - - -



                   SETTLEMENT HEARING


                       - - -

----------------------------------------------------------
                 CHANCERY COURT REPORTERS
           500 North King Street - Suite 11400
             Wilmington, Delaware 19801-3759
                     (302) 255-0525

```
1    APPEARANCES:

2         P. BRADFORD deLEEUW, ESQ.
          Rosenthal, Monhait & Goddess, P.A.
3              -and-
          JUAN E. MONTEVERDE, ESQ.
4         of the New York bar
          Faruqi & Faruqi, LLP
5           For Plaintiff Thomas Turberg

6         R. JUDSON SCAGGS, JR., ESQ.
          Morris, Nichols, Arsht & Tunnell LLP
7           For Defendants ArcSight, Inc., Thomas J.
            Reilly, Sandra Bergeron, William P. Crowell, E.
8           Stanton McKee, Jr., Craig Ramsey, Scott A.
            Ryles, Ted Schlein, Roger Siboni and Ernest Von
9           Simson

10        KELLY A. COSTELLO, ESQ.
          Morgan Lewis & Bockius, LLP
11             -and-
          JILL M. BAISINGER, ESQ.
12        of the Pennsylvania bar
          Morgan Lewis & Bockius, LLP
13          For Defendants Hewlett-Packard Co. and
            Priam Acquisition Corp.

14

15                         - - -

16

17

18

19

20

21

22

23

24
```

CHANCERY COURT REPORTERS

3

1          MR. MONTEVERDE:  Good morning, Your

2    Honor.

3          THE COURT:  Good morning,

4    Mr. Monteverde.

5          Mr. deLeeuw, how are you?  Are you

6    introducing?

7          MR. deLEEUW:  Yes, Your Honor.

8          THE COURT:  Welcome.

9          MR. deLEEUW:  I rise solely to

10   introduce my co-counsel, Juan Monteverde of

11   Faruqi & Faruqi.

12         We also have with us today observing

13   the proceedings, Miss Alexandra Marchuk.  She's not

14   yet been admitted.

15         THE COURT:  Working on those clerkship

16   requirements?

17         MR. MONTEVERDE:  She is joining our

18   firm.

19         THE COURT:  You are elsewhere?

20         MISS MARCHUK:  In New York.

21         THE COURT:  We won't hold that against

22   you too much.  We like New Yorkers.

23         MR. MONTEVERDE:  Thank you, Your

24   Honor.

4

1          THE COURT:  Mr. Monteverde, how have

2   you been?

3          MR. MONTEVERDE:  I've been okay.

4   That's my client, Your Honor.

5          THE COURT:  So who is Mr. Turberg?

6          MR. MONTEVERDE:  He's an individual --

7   he actually has been represented by my firm before and

8   he's an individual that actually had 2500 shares in

9   ArcSight worth approximately 100 grand.  And he was

10  one that did not like the transaction as it was

11  structured and the price itself.  And certainly

12  because he has a relationship with my firm, he

13  contacted us and told us that he had these shares and

14  asked us if we could assist him, and we certainly were

15  happy to do so.

16         Your Honor, just for putting things

17  into context, when this transaction was announced

18  September 13th, 2010 -- and quite frankly, what caught

19  my eye -- my attention -- was the top-up that was

20  structured in this transaction.  At the same time,

21  Your Honor, I was co-lead counsel in the Cogent matter

22  that later I took to preliminary injunction before

23  Vice Chancellor Parsons.  The reality is, the world

24  did change after October 5th when that ruling came

5

1   down.  As this transaction was announced, 34.5 million

2   shares outstanding, with 150 million authorized and a

3   top-up option, and you had a lock-up agreement of

4   19 percent to insiders and 15 percent of other related

5   parties.  Quite frankly, Your Honor, I did not like

6   it.  I do understand that maybe my views are not the

7   same as this Court, but I certainly think, before the

8   decision in Cogent, and as well Your Honor's

9   involvement in NCXT in late September, I think we had

10  more than a good-faith basis to really attack this

11  transaction.

12              THE COURT:  That's helpful.  I've got

13  to tell you, one of my questions was going to be what

14  inspired you.  It did seem like an arm's-length deal

15  that had a significant premium.

16              MR. MONTEVERDE:  That was the

17  motivation.  Your Honor, quite frankly, has seen me

18  appear before this Court before.  Maybe I'm too

19  inspired at the time.  I certainly like inspiration.

20  I don't do cases for the sake of doing them.  And I

21  like this case.

22              (At this time R. Judson Scaggs entered

23  the courtroom.)

24              THE COURT:  Good morning, Mr. Scaggs.

CHANCERY COURT REPORTERS

1          MR. SCAGGS:  I'm sorry, Your Honor.

2    Am I late?

3          THE COURT:  No.  I think I actually

4    looked at the clock as we were walking in and I

5    realized we were starting two or three minutes early.

6          MR. SCAGGS:  I'm so sorry, Your Honor.

7          THE COURT:  It's my fault.  As I say,

8    as I walked in, I noticed that the clock was about two

9    or three minutes before.  So don't feel badly.  It's

10   good to see you.  It's not daylight savings time.

11         MR. SCAGGS:  Your Honor, I'm prepared.

12   I like to be two minutes early.  I'll sit down and not

13   hold things up.

14         THE COURT:  No problem at all.  As I

15   said, you were probably here precisely on time and I

16   made the mistake of walking in a couple minutes early.

17         MR. MONTEVERDE:  Like I was saying,

18   the top-up is what inspired us to join in.  And I'm

19   very proud of this settlement, for two things, Your

20   Honor: one, because there was also litigation that

21   ensued in California brought by my colleagues

22   Robbins Geller on the West Coast.  And we were able --

23   and, quite frankly, I think the tender offer and the

24   timing might have helped us be able to reach agreement

1   and coordinate the litigation from inception.  But

2   that was one thing I'm proud of.  I'm proud because

3   multi-jurisdiction was cured here.  We were able to

4   litigate together, without the Court's intervention,

5   without wanting to have defendants move for stay

6   against the other or have one more motion that had to

7   be filed.  But I'm also proud about the actual result.

8   The reason why, Your Honor, after the discovery with

9   defense counsel, we uncovered that actually there were

10  multiples that had not been disclosed.  I'm not

11  talking about they just had a reference range and now

12  we want every single multiple, which we did get for

13  2011.  We discovered actually 2010 multiples -- this

14  is happening in the middle of 2010 -- relevant to

15  shareholders were considered by the board.  Nowhere in

16  the 14D-9 that was even mentioned.  So I'm proud that

17  we fought and that we actually were able to persuade

18  defendant to disclose that.

19              What I found this morning -- if I

20  may --

21              THE COURT:  Can you focus me on that,

22  because what I was focused on in terms of the multiple

23  disclosure was the essentially detailed information

24  you got on the comparables.  What is this that you're

8

1  speaking of?

2                    MR. MONTEVERDE:  Well, it's both, Your

3  Honor.  If I may approach, I actually made it separate

4  photocopies.  It may be easier for Your Honor.

5                    THE COURT:  Sure.

6                    MR. MONTEVERDE:  Thank you, Your

7  Honor.

8                    THE COURT:  Did Mr. Scaggs get one?

9                    MR. MONTEVERDE:  I'm doing that as we

10  speak.

11                    THE COURT:  This is just the same as

12  what I got.  What did you do special to it?

13                    MR. MONTEVERDE:  I actually made the

14  photocopies of the portions.  You do have it, Your

15  Honor.  I just wanted you to have it handy.

16                    THE COURT:  I thought you had done

17  something nice, like highlighting it and putting in

18  fancy colors.

19                    MR. MONTEVERDE:  No.  I figured my

20  voice would be the highlight.

21                    THE COURT:  Everything always sounds

22  better when said with an accent.  Everything always

23  sounds better and more persuasive when said with an

24  accent.

1      MR. MONTEVERDE:  That may be why my

2 firm keeps sending me to these hearings.  I don't

3 know.  But I'm happy to be before Your Honor.  Let me,

4 if I may, Your Honor, if you turn to page two of the

5 amendment, which has the 14D-9 amendment, No. 2, and

6 page 28, which would be the fourth page of the

7 excerpt.

8      THE COURT:  Okay.

9      MR. MONTEVERDE:  Actually, my

10 apologies.  Page 27.  Your Honor will see, after the

11 list of the companies that starts with Blue Coat

12 Systems, it says there that, for purposes of this

13 analysis, Morgan Stanley analyzed the following

14 multiples and below it bullets two numbers.  It says

15 the 2011 earnings per share and the revenue.  And

16 then, if Your Honor turns the page, Your Honor only

17 sees a reference range for those numbers and implied

18 values.

19      Well, after discovery we uncovered

20 that they also reviewed 2010 numbers.  Your Honor, if

21 I may direct Your Honor's attention to the other

22 document, the 14D-9 amendment, on page two, Your Honor

23 will see a big chart.  It not only not shows every

24 multiple -- so, yes, Your Honor is correct -- there's

1    additional detail.  Your Honor will also see there is

2    the 2010 revenue multiples as well as the EBITDA

3    multiples for both 2011 and 2010 and the earnings per

4    share for 2010.

5                    What the original 14D-9 had -- what

6    shareholders were told was Morgan Stanley only reviews

7    2011 multiples.  Not fully correct, Your Honor.

8    Morgan Stanley also reviewed 2010 multiples and also

9    provided them to the board of directors in their

10   presentation of September 12th.

11                   THE COURT:  I must not be

12   understanding.  I see the chart.  It starts with

13   Blue Coat Systems on the top and goes across 2010.

14                   MR. MONTEVERDE:  Correct.

15                   THE COURT:  Is your point just that it

16   includes both the 2010 information and the 2011

17   information?

18                   MR. MONTEVERDE:  Yes.  But the

19   original 14D-9 only had 2011 information.  No word in

20   the supplement -- in the original 14D-9.  There was no

21   indication the 2010 was observed and presented to the

22   board.

23                   THE COURT:  Somebody is beeping.  Who

24   is beeping?

1          THE COURT REPORTER:  That was me, Your

2     Honor.  It was my laptop.

3          THE COURT:  Oh, that was you, Diane.

4     It's an hourly rate beep.  Whatever your hourly rate,

5     Mr. Monteverde, that gives you an incentive to

6     mitigate and to somewhat moderate your hourly rate

7     contentions.

8          MR. MONTEVERDE:  That's why I don't

9     bring my BlackBerry or cell phone inside, Your Honor.

10    I hopefully get the entire amount and I don't have to

11    worry about the beeping penalties.

12          THE COURT:  It's less than the

13    Chancellor.  The last time the Chancellor had this

14    happen, he was considering pro hac revocations.  One

15    or the other, either way.

16          Did they ever give the 2010

17    information for ArcSight?  I see page 28 has the 2011

18    information for ArcSight.  Is there some similar --

19          MR. MONTEVERDE:  Your Honor is

20    correct.  The analysis here focused on what are the

21    numbers of the companies that they looked at.  The

22    2010 numbers one could get and there actually was

23    analysts following.  They were street reports.  So

24    certainly we're starting with the premise, obviously,

1    that this is material information.  A shareholder who

2    actually wants to look at things and use the

3    information will know how to utilize this information.

4    One could actually go on Yahoo Finance or Bloomberg,

5    whichever, and pull estimates for ArcSight and they

6    would be available and they could then use these

7    multiples.  I think what's important, Your Honor, and

8    what I want to focus this Court's attention this

9    morning, is the original 14D-9 was silent.

10                   THE COURT:  Was what?

11                   MR. MONTEVERDE:  Silent.  Did not

12   discuss that they also observed EBITDA multiples and

13   did not discuss that they looked at 2010 numbers.  I

14   felt not only this was a victory, I felt, quite

15   frankly, if defendants would not agree to give us this

16   information, I would be comfortable coming before Your

17   Honor on a preliminary injunction and saying, "Your

18   Honor, we start with Pure Resources, that a fair

19   summary must be disclosed to shareholders of material

20   information presented to the board."

21                   THE COURT:  Look, maybe you ought to

22   do that some time because, you know, it's odd that

23   these banker books go to the board.  And I've seen a

24   lot of banker books.  The banker book that goes to the

1    board never just has a list of names and then

2    reference ranges.

3                    MR. MONTEVERDE:  Correct.

4                    THE COURT:  The banker book that goes

5    to the board invariably has a chart like this.  And

6    can you imagine what the directors would say if they

7    got a book that just had a list of names and then a

8    bottom line reference range?  I mean, they'd say,

9    "What are you doing, Morgan Stanley?  Where is your

10   backup?"  Right?

11                   MR. MONTEVERDE:  Exactly.

12                   THE COURT:  Can you imagine the due

13   care claim that there would be if that was all the

14   board book contained?

15                   MR. MONTEVERDE:  But if I may, Your

16   Honor --

17                   THE COURT:  You would be excited about

18   that.

19                   MR. MONTEVERDE:  I would be very

20   excited.  In this case I also was excited because, in

21   the first 14D-9, the one issued on September 22nd, it

22   says Morgan Stanley analyzed the following statistics:

23   Earnings per share for 2011 and revenue for 2011.

24                   On the improved 14D-9, now it says

14

1    Morgan Stanley analyzed the following statistics: 2010

2    and 2011 revenue, EBITDA 2010 and 2011, and earnings

3    per share 2010, 2011, and then they give a summary of

4    those numbers.

5              Your Honor, the original 14D-9 did not

6    say anything about EBITDA or 2010.  Those were key

7    inputs given to the board.  I agree with Your Honor

8    that the victory is not that we disclosed necessarily

9    the multiples.  The bigger victory is that we

10   uncovered that they also looked at 2010 numbers, they

11   also looked at EBITDA numbers.  Shareholders were not

12   told that.  This is a different document.  I mean --

13             THE COURT:  I think I view this a

14   little bit differently than you in that respect.  I

15   don't think that there's -- I guess you could say that

16   that's some type of omission.  But really what we're

17   doing is we're debating what fair summary means.  And

18   at least initially the banker's view of the world was

19   fair summary meant we just give you our bottom line

20   conclusion.  Then, when it turned out that they were

21   wrong about that -- and Chancellor Strine gets really

22   credit for all this -- what they started saying was

23   fair summary meant you only get the bottom line

24   conclusion of each of our individual analyses.

1          So then it turned out, as

2   Then-Vice Chancellor Strine explained it, "No,

3   actually, they were wrong about that.  Fair summary

4   actually means summary, not just your conclusions."

5          So then we started getting these lists

6   of names, without any other information, so that

7   stockholders could, I guess, go on an informational

8   scavenger hunt and try to develop for themselves all

9   of the multiples.  So really what I hear you saying is

10  the value that you provided was that you got actually

11  a fair summary.

12          MR. MONTEVERDE:  That was not before.

13  And it was omissions, Your Honor.  I mean, I think

14  it's very important -- Your Honor, we can certainly

15  disagree, but I will -- as I stand before Your Honor,

16  not only am I proud of the settlement, I would have

17  liked to have brought this triple injunction.  I would

18  have definitely liked it.  I think I would have had

19  fun.  And I think Your Honor would have sided with me

20  at a preliminary injunction.  I don't know.

21          THE COURT:  Here's my question for

22  you.  Maybe it's --

23          MR. MONTEVERDE:  I could probably

24  answer it, Your Honor.

1          THE COURT:  That's okay.  A lot of

2   times backup in the board book is in the form of a --

3   I'm going to get landscape and portrait backwards --

4   but it's a horizontal page; right?  It's not a

5   vertical page like this.  It's a horizontal page.  Is

6   this landscape?  There you go.

7          MR. MONTEVERDE:  They were graphs.

8          THE COURT:  See, because what is

9   troubling to me and to other members of the Court is

10  to get into the details of drafting these banking

11  summaries and sort of deciding how much of the chart

12  you put in.  So I was assuming that this corresponded

13  to a landscape table in the board book of the kind

14  that I would often see, and that this was basically

15  all the columns on there.  Is that right?  Or did you

16  pick and choose some of the columns and not others?

17          MR. MONTEVERDE:  I mean, it is right

18  in the sense that the information is the same.  But

19  instead of doing -- I'm happy to lend this to Your

20  Honor with --

21          THE COURT:  Why don't you hand it up.

22  Is that the presentation?

23          MR. MONTEVERDE:  It's my only copy.

24          THE COURT:  Let me take a quick gander

1  and maybe I'll give it back to you.

2               MR. MONTEVERDE:  And if I may just,

3  for illustration, Your Honor, I think what they do --

4  so from every graph they put the multiples for every

5  company and then they develop that into a table.  It's

6  all the numbers in that page.

7               THE COURT:  The only difference

8  between this and what I was envisioning in my head was

9  often you get a sheet of paper that looks like this

10 page of transaction matrix --

11              MR. MONTEVERDE:  Correct.

12              THE COURT:  -- where they're looking

13 at the data in a chart form rather than in a table

14 form.

15              MR. MONTEVERDE:  Yes.

16              THE COURT:  Graphics are great.  This

17 just does the same thing as graphics.  The old school

18 way used to be to put them in terms of numbers.

19              Look, I understand where you're coming

20 from on that.  So you got that.

21              Here, Donna, why don't you give that

22 back to Mr. Monteverde.

23              MR. MONTEVERDE:  Not to stress it

24 again, Your Honor.  For me, the victory?  2010 not

1    even mentioned.  EBITDA not even mentioned.  We got

2    it.

3                    THE COURT:  Again, what it gets back

4    to, it's not -- it's a problem because therefore it

5    wasn't a fair summary.  They were only telling

6    stockholders 2011 when they actually also considered

7    2010.

8                    MR. MONTEVERDE:  Correct.  We got it

9    in the first summary.  And that's the comparable

10   company analysis is where we start, but it was across

11   the board.  We saw sort of that theme -- the theme,

12   I'll call it.

13                   The next disclosure we got is that the

14   research analyst report again just said originally --

15   if we turn to the next page, Your Honor.  If Your

16   Honor wants to see this in page 28, there's the second

17   analysis that follows.  It's titled, "Equity Research

18   Analysts' Price Targets."

19                   THE COURT:  I get this.

20                   MR. MONTEVERDE:  The last sentence

21   said $32.  Guess what, Your Honor?  They also had a

22   $40 price target.  What they say is we're not going to

23   disclose that because that might have been affected

24   because there was a leak to the market.  I'm sorry,

1    but I think shareholders need to know that.  We got

2    that, Your Honor.

3                    The same thing on the next one for the

4    precedent transactions analysis, Your Honor.  What

5    originally was disclosed were just reference ranges.

6    And here now what we said is, we would like the entire

7    data to be provided, and we got it.  And that's on

8    page six of the amendment.

9                    THE COURT:  Here's my question for

10   you.  One of the things that troubles me about these

11   types of things is that you create this situation

12   where the bankers have an incentive to not put in this

13   stuff.  The issuer has an incentive not to really push

14   hard back on the bankers, and then you all come along

15   and you can add this stuff in and get a settlement

16   that supports a fee.  How do I solve that problem

17   where people actually put this stuff in the first

18   time?  And maybe it puts a little bit more pressure on

19   you to find some transactions where there's real stuff

20   going on.  But how do I break this circle of

21   supplementation?

22                   MR. MONTEVERDE:  I think the way you

23   break that, Your Honor, I don't think it's to chastise

24   or punish the firms who actually are focusing on what

1    I think are the more important enhancements and that

2    actually uncover data that was not summarized.  I

3    think that will happen.  That's going to continue to

4    happen because not every banker -- quite frankly, Your

5    Honor, we focus in this case -- I have my theory why

6    they didn't -- why ArcSight did not put in 2010

7    numbers because there were higher multiples.  That's

8    my theory.  I could be wrong.  If you calculate that,

9    I think a shareholder would have seen that and said,

10   "Gee, the multiples for earning per share for 2010 is

11   43 and the earnings per share, I think, is $.77.  That

12   means 35 bucks."  But if you look at the actual 2010,

13   it's 53.  That that's more like 40 or 45.  The offer

14   is 43.50.  Maybe it doesn't look as good.  I don't

15   know.  We don't know that.  This is my own

16   Monteverde's theory.  It could be right or wrong.  I

17   don't think you punish firms that are actually working

18   hard, are willing to take things to preliminary

19   injunction.

20              And as to the other settlements that

21   Your Honor may be confronted where it's just an

22   enhancement, maybe Your Honor should do what Your

23   Honor has done in other cases and say, "Wait a second.

24   This may be just a settlement that was just done, so

1   it could support a waiver or a release of a Revlon

2   claim."

3                   THE COURT:  Here's the thing.

4                   MR. MONTEVERDE:  But I don't think

5   that's before Your Honor today.

6                   THE COURT:  You didn't do very much.

7   You really didn't.  You filed three days after it came

8   out.  You got sort of standard-ish documents, 2,300

9   pages.  You didn't take any pre-MOU depositions and

10  you got supplementations.  But for this bankers stuff,

11  I don't need to say whether it's material or not.

12  It's certainly better disclosure.

13                  The other stuff you got, some of these

14  things I wasn't too impressed with.  I almost feel

15  like I've got a difficult choice where one alternative

16  is to criticize you and beat you up for settlements.

17  You don't enjoy that.  I don't really enjoy that.  The

18  other alternative, I guess, would be really to be

19  generous with you and to start saying, "Look, you get

20  this type of information on bankers?  We're talking

21  millions."  And then if the issuer and the acquiror

22  start thinking, "So, my goodness, we're going to have

23  to pay millions for this," maybe they'll get their

24  bankers to put it in in the first instance.

1          MR. MONTEVERDE:  Me, personally, I

2     like the lottery, Your Honor.

3          THE COURT:  You would probably get

4     that once because, after that, the bankers would start

5     putting it in.

6          MR. MONTEVERDE:  I know there's a lot

7     of disclosure settlements going on.  I know that, Your

8     Honor.  But the reality is, I really think this was a

9     good one.  I know Your Honor thinks, "Look, you guys

10    didn't work that hard."  We worked very hard for a

11    month.  I managed to get multi-jurisdiction under

12    control.  I think that's a plus.  And I uncovered this

13    was not given, Your Honor.

14         THE COURT:  Tell me about your hours.

15    How did you get to your hours?  Whack it up for me.

16         MR. MONTEVERDE:  Whack it up to you.

17    I think we have around 250 grand, roughly, for my firm

18    and I think about 200 grand is pre-MOU, and probably

19    half of that is my time, which equates to maybe

20    170-some hours.  I pretty much worked on this case,

21    Your Honor -- I remember settling this case because

22    our office was closed, it was Columbus Day, and I was

23    working through the weekend and I was there on Monday.

24         THE COURT:  Look, I've done these

1    cases.  You know, 2300 documents, to review that?

2              MR. MONTEVERDE:  Right.

3              THE COURT:  Even if I give you a

4    minute a page, you're not much more than 40 hours.

5              MR. MONTEVERDE:  No, Your Honor.  What

6    happened is, you have a tender offer.  If this breaks,

7    if we don't have a settlement after that weekend, we

8    would be before Your Honor with an opening brief which

9    was ready, Your Honor.  I cannot wait for defendants

10   to tell me, "We've been talking for three days.  You

11   know what?  See what you do."  Your Honor, I don't.

12             THE COURT:  You're telling me that you

13   were doing all those other things?

14             MR. MONTEVERDE:  Maybe people say,

15   "You know what?  That's inefficient."  I do this, Your

16   Honor.  I know how the game works.  So I need to have

17   everything ready, every motion that I can think of,

18   subpoenas, commissions.  I don't know how people are

19   going to react.  I don't know if they're going to

20   solicit the banker.  I don't know.  I have to already

21   know who I'm going to contact at outside counsel for

22   the banker.  That takes investigation.

23             Your Honor, this case, I don't think

24   the fees -- and I know Your Honor has hesitation and I

1   guess we're jumping ahead of it, but I don't think the

2   500,000 fee request here is generous, because, one,

3   it's multi-jurisdiction litigation.  And Your Honor

4   says the reality of them means this is not something

5   that we keep for ourselves entirely.  This needs to be

6   sure with other law firms.  That's a reality.  They

7   also worked on the case.

8            Two, I go back to maybe I'm prouder

9   than I should be.  I think uncovering the 2010 numbers

10  and that the banker put it under fairness opinion, or

11  an analysis in support of their fairness opinion and

12  the board of directors got to consider that, the

13  multiples in 2010 were higher than 2011 and we got

14  that disclosed, I think that's a home run.  I think

15  the disclosure alone warrants the approval of the

16  settlement and the fee requested.

17           But we did not stop there.  We got

18  enhancement disclosures for every analysis, which

19  included in the present transaction every multiple.

20  That's financial information.  We then got

21  background -- not voluminous disclosures, Your Honor,

22  but two very important.  One, what kind of buyers were

23  you looking at?  They were all strategic.  Are there

24  any standstills enforceable or in play right now?  No,

25

1    they were not.  Someone could come in and make a bid

2    on how to review the company.  I think that's also a

3    very important disclosure and has a lot of meaning, at

4    least for those who understand how the process works.

5                    Three, we got information about the

6    top-up -- how the top-up worked.  First, I did not

7    like the top-up.  I said that before.  At a minimum, I

8    got them.  At least let the shareholders know how many

9    shares you have, how many reserve, how this would be

10   triggered.

11                   Now, a shareholder that really wants

12   to find out?  Yes, they can go through 10-K, the 10-Q

13   and figure it out probably.  Why make the shareholder

14   have to do that homework when you are giving a top-up.

15   You should fully disclose it.

16                   Quite frankly, Your Honor, I'm also

17   proud about that section because, after this 14D-9,

18   every -- I don't want to say "every" -- most of them

19   have been disclosing the mechanics and the numbers.

20   I'm not responsible for sending -- I don't know.  But

21   I'm proud of it.

22                   THE COURT:  You're a trendsetter.

23   We're bleeding into the fee issue here.  I think

24   there's value to that type of disclosure enhancement.

1   That's the thing that firms, like Mr. Scaggs, get

2   called on to do all the time.  You read proxy

3   disclosures.  We give people comments.  You know what?

4   That takes like two hours.  And you give them a

5   markup.  You have a telephone call and that's a

6   one-day gig.  Maybe there's some ongoing thing, but

7   it's not a 500,000 bill.

8            MR. MONTEVERDE:  Well, Your Honor, he

9   gets paid every time.  I don't.  I think that has to

10  be put into play there a little bit.

11           Also, I don't think we focus on the

12  hourly.  We focus on the value.  I think Your Honor

13  said it before.  I think Your Honor said it first in

14  Novell Pharmaceuticals, and I think it might have been

15  one of Your Honor's first final hearings where the fee

16  was contested and Your Honor there said, "Look, we

17  still have 400, 500,000."  Decent disclosures.  Dial

18  up or dial down.  I think they're good disclosures

19  that put us there.  And I think I got -- quite

20  frankly, if I was doing this on a contested fee --

21  Your Honor may laugh here -- I would ask for more than

22  500,000.  I advised Your Honor, Your Honor will laugh.

23  But I would.

24           (Laughter.)

1      THE COURT:  You're a good man,

2  Mr. Monteverde.

3      Go to page 33 of your brief.  This is

4  where you're talking about the efforts of counsel.

5  You say you did a pre-suit investigation of the facts

6  and analyses of the proposed tender offer merger.

7  Tell me about your pre-suit investigation.

8      MR. MONTEVERDE:  The pre-suit

9  investigation essentially involves looking at the last

10  10-K, 10-Q for ArcSight, looking at what HP has bought

11  before.  It turned out that HP, after this

12  transaction, has started to buy other companies.  They

13  needed to start up companies to compete.  One of the

14  reasons why it turned out that this case ended up with

15  the going price, they actually ended up paying 52

16  times EBITDA, which has actually been one of the

17  highest payouts.  That's one of the reasons why we

18  think our price case wasn't much of a price case.  But

19  we don't know that.

20      THE COURT:  You know something about

21  it.  I appreciate you saying that you got into this on

22  the top-up.  I looked at this and I saw a big premium,

23  third-party arm's-length deal.  And it did seem a

24  little bit strange that you saw a massive fiduciary

1   wrong.  But I understand that you got into it for the

2   top-up.

3              Now, the next thing is consultation

4   with your evaluation.

5              MR. MONTEVERDE:  That's the next

6   thing.  What we do is, we actually have three or

7   four --

8              THE COURT:  Who is the guy?

9              MR. MONTEVERDE:  Matthew Morris from

10  RGL.  Actually, if I recall correctly, Your Honor, we

11  had two experts here.  Because what happened is, when

12  we started the case, I was not working with my

13  colleagues at Robbins Geller.  I think they retained

14  Matthew Morris.  I believe I retained Cynthia Jones

15  from FMA.  And what happens is, as part of her

16  consultation, what we do typically -- I do -- I

17  contact three or four experts that I like.  I talk to

18  them briefly.  Then they run the conflicts.  They come

19  back, yeah, nay, and then we sort of discuss the next

20  steps.

21             I don't normally -- this is me -- I

22  don't like using the same one over and over.  One,

23  because I think you get into the issue of bad habits

24  or the same things over and over.  I like, also, to be

1    challenged.  I like to sometimes try someone new, try

2    different things.

3                    THE COURT:  It's not going to look

4    good if you got the quasi in-house trained expert.

5                    MR. MONTEVERDE:  That also may be one

6    of the reasons, Your Honor.  So we have several

7    experts that we looked at.  That takes time.

8                    THE COURT:  How much did Mr. Morris

9    make on this?

10                   MR. MONTEVERDE:  Roughly, I want to

11   say 14 grand, 13 grand.

12                   THE COURT:  Now, down at the bottom of

13   the page, what complex financial information did you

14   master?

15                   MR. MONTEVERDE:  Well, Your Honor,

16   actually been able to understand how multiples work

17   and how --

18                   THE COURT:  You knew that before;

19   right?

20                   MR. MONTEVERDE:  I knew that before.

21                   THE COURT:  You didn't have to educate

22   up to this case.

23                   MR. MONTEVERDE:  You don't have to be

24   educated for the case, but certainly you have to

1   revisit certain things.  I certainly do know how

2   multiples work, generally.  To be frank, Your Honor,

3   I'm not a banker.  I don't do it every day.

4                    THE COURT:  Can we agree that's

5   probably a little bit of a nervous statement for this

6   case?

7                    MR. MONTEVERDE:  I think there are

8   persuasive papers.  You try to put everything in the

9   best light and accurate.

10                   THE COURT:  You try to be accurate;

11  right?  Did the prosecution of this action require an

12  extensive effort by plaintiffs' counsel to master

13  complex financial information?  This is what you do;

14  right?

15                   MR. MONTEVERDE:  This is what I do.

16  The one thing I can defend a statement is saying,

17  "Well, it requires that I half master it" --

18                   THE COURT:  That's not what you said.

19                   MR. MONTEVERDE:  Your Honor, I

20  certainly take note of that, and I don't think Your

21  Honor is going to see that sentence again.

22                   THE COURT:  I got to tell you, part of

23  what I think you guys ought to think about -- you

24  guys -- I don't mean that in gender-specific sense --

1    but when people come in and they oversell things, it's

2    something that I notice.  I think that this is a

3    settlement where you got some stuff, you got some

4    disclosure enhancement.  You are very fortunate that

5    the defendants didn't oppose.  This isn't a home run

6    case and you didn't have to master complex financial

7    information.  If that was the case, you would have

8    asked for a lot more; right?

9             MR. MONTEVERDE:  I will tell Your

10   Honor, sometimes you use words that may read well.  I

11   hear Your Honor's comment.  I can see --

12            THE COURT:  I do read these briefs.

13   You realize that.  I do read them.

14            MR. MONTEVERDE:  And I do appreciate

15   that.  I want Your Honor to read it because you're

16   telling me what you're telling me.  I'm taking notice,

17   and I will certainly take that into consideration and

18   actually react to it going forward.  I don't think we

19   punish someone for a couple misused words, if you want

20   to even say that, when I think -- again, Your Honor

21   does not agree this is a home run, or not with me.  I

22   actually think it's quite a bit of a home run.  But I

23   don't do baseball.  I don't know much.  I think they

24   go around somewhere.

1           THE COURT:  What is your sport,

2    Mr. Monteverde?

3           MR. MONTEVERDE:  You know, Your Honor,

4    everyone actually makes fun of me because I'm from

5    Spain but I don't really follow soccer.  My parents

6    were intellectuals, so Plato and the Republic was more

7    my focus than sports.

8           THE COURT:  I'll tell you what, then.

9    I want your briefs to be accurate, like Platonic

10   forms.  I do not want them to be the shadows of the

11   cave.  It struck me when I was reading the prosecution

12   of this action required an extensive effort by

13   plaintiffs' counsel to master complex financial

14   information, that strikes me as the shadow on the wall

15   of the cave made by the shadow puppets that are being

16   carried around.  And, you know, look, as I say, you

17   come in here a lot.  I don't want to beat you up on it

18   and I appreciate you're going to take note of it.

19           MR. MONTEVERDE:  Yes.  And so what

20   we're left with is just essentially a summary.  There

21   were three focus of disclosure.  It was the

22   financials, it was the background and the enforcement

23   of the standstill agreement and the top-up disclosure

24   of how the mechanics worked.  We were happy about it.

1  We then took depositions post-close, confirmatory

2  discovery.  We were satisfied the settlement was fair,

3  reasonable and adequate.

4          THE COURT:  I was glad to see that

5  Morgan Stanley seemed to have put forward a real

6  banker for you.

7          MR. MONTEVERDE:  Yeah, Mr. Marth.

8  And, Your Honor, we took a lot of time.  I actually

9  remember with a stipulation of settlement there were

10  some issues, but we were able to finally submit it to

11  this Court on June 1st.  Your Honor entered a

12  scheduling order on June 15th, as of which was the

13  result of 7,776 notices were sent.  Not one objection.

14  So I do think that also merits some consideration.  I

15  think the settlement should be approved.

16          THE COURT:  I think it suggests that

17  people are rationally apathetic, that they know the

18  fee is coming out of somebody else's pocket and that

19  there's a really great deal here, and that it actually

20  would -- to write the objection letter means that you

21  don't get to spend that hour with your kids.  You

22  know, this is a friction lost.  I know we have cases

23  that say the absence of objections is warranted.  In a

24  context where you actually empower class counsel to

1    act because of the premise the stockholders are

2    rationally apathetic, the absence of objections is

3    consistent with the whole premise of class counsel.

4    It's not inherently supportive of the settlement.

5              Now, maybe if you had some radically

6    out-of-range settlement, people might get fired up

7    enough to write in.  So I don't give much weight to

8    that.

9              MR. MONTEVERDE:  I still think it's a

10   very good settlement.  Fair enough, Your Honor.  I

11   think certification is warranted here.  From

12   announcement September 13th through October 22nd --

13             THE COURT:  I don't have any questions

14   about that.

15             MR. MONTEVERDE:  The fee.  I know Your

16   Honor has hesitation about it.  I do think 500,000 is

17   within the range of reasonableness.  I will be the

18   first to admit it is maybe at the end, but it is

19   within that range of fairness and what's reasonable.

20   I think the lawyers involved here are lawyers that we

21   do this.  I thought we did a good job.  And I think,

22   quite frankly, the multi-jurisdictional avoidance of

23   litigation by having firms with different clients in

24   different jurisdictions work together which, at the

1   end of the day, means we have to share in, I think

2   that also is something to consider.  I'm not saying

3   that's a weight or a factor that should be added on to

4   the Sugarland factors, Your Honor, but I do think it's

5   something that adds to it.

6           I don't have anything further, unless

7   Your Honor needs me to continue talking so I can

8   persuade Your Honor that the approval of the

9   settlement, class certification and the full fee is

10  warranted here.

11          THE COURT:  There you go.

12          MR. MONTEVERDE:  Thank you, Your

13  Honor.

14          THE COURT:  Mr. Scaggs, what do I do

15  about this banker disclosure problem?  You do a lot of

16  this.  Do you have any thoughts for me?  Instead of

17  trying to intervene in the market and keep fees

18  reasonable, why shouldn't I start letting fees climb

19  for that banker disclosure so that eventually people

20  put the information in?

21          MR. SCAGGS:  It's a real problem, Your

22  Honor.  And we -- thank you for the chance to give you

23  input.  As someone who is working within the system,

24  as opposed to someone running the system like yours,

1   it is a real quandary because --

2                   THE COURT:  The Supreme Court is

3   frequently ready to remind me that I'm not running the

4   system.  I hear you.

5                   MR. SCAGGS:  More so than me, Your

6   Honor.  I think the best thing that can be done,

7   because if you're looking at the kind of certainty

8   that Delaware law has provided to corporations and

9   given us the lead, and the things that we value

10  because we want to be able to give that, you could go

11  with the federal system that says -- I mean, there's

12  actually regulations.  And I don't think that's all

13  that helpful.  We have those that say, "If you have

14  multiples, they go in."  That's one way to certainty.

15  What this Court provides is the flexibility to look at

16  those in context.  So I think it will require some

17  more pain in development of case law.

18                  What would be helpful to us is if this

19  Court has the opportunity -- like you did -- I was all

20  ears, if you saw.  These transcripts, as Your Honor

21  knows, get circulated.  But the more that we can learn

22  about what the Court expects in multiples, or

23  anything, the better those disclosures will be,

24  because we have to go back and often are not involved

1   first line on these things, or fairly late in the

2   transaction, and say you need to do this or you'll get

3   enjoined, quite frankly.  All that can help with

4   regards to the incentives.

5                   THE COURT:  Once you get to the point

6   of the injunction phase, though, like this would have

7   been a high premium deal.  It would have been a tough

8   call to put that deal at risk, even for a 20-day

9   period to get multiple enhancement, even though I

10  think that ought to be in there.  So it creates this

11  problem.  And it strikes me that, you know, I've

12  got -- part of me thinks that I ought to continue to

13  beat up poor folks, like Mr. Monteverde, for settling

14  easily for this stuff, because maybe next time he

15  takes it and then we get to learn it.  But the

16  alternative, as I say, would be to back off and let

17  fees rise.

18                  Have you and Mr. Alexander thought

19  about getting together with the other deans of the

20  Delaware bar and coming up with a model banker

21  disclosure that would, you know, talk about how you

22  put in a reasonable summary of what's in the board

23  book?

24                  MR. SCAGGS:  Well, I think there's

1    pieces of that.  That's a great idea, Your Honor.

2    Certainly that kind of document that we could work

3    through in the corporate law section could be very

4    helpful.  Yeah, I think that's a great idea.  In that

5    comprehensive manner, no.  There is talk and there

6    is -- there's a firm that has its memo -- the more we

7    can learn about the Court's attitudes the better,

8    because we all have our memos and what we know should

9    go in.  And then there's the gray areas that become

10   contextual.

11              As far as the economic incentives, I

12   really didn't answer Your Honor's question.  But let

13   me suggest one other perspective, which is this

14   information may get out.  I mean, it's there.  I do

15   have hesitance, as a person who works within this

16   system, that we do get in a situation where there's

17   settlements, and it's a supplement, and we have to

18   come to Your Honor on a disclosure-only settlement.

19   Everybody knows these days this Court is taking hard

20   looks at that.  There's no doubt about that.  It's out

21   there.  I can assure Your Honor, we have able counsel

22   scouring these things and come back.  Then you have

23   this tad better disclosure.

24              One could look at it from a

39

1    perspective and say this is about right where it

2    should be because these things are happening.

3    Unfortunately, it creates another court evolution, and

4    here we are talking about that.  But whether or not

5    you need to run the fees up and down, we're here in

6    Delaware, the disclosure happened, and we have a

7    midrange fee that wouldn't be considered low enough --

8    they request low enough -- to have them not bring the

9    case, but not so high it could cause other unintended

10   repercussions within the community.  Having said that,

11   I'll sit down.

12                THE COURT:  No, I appreciate it.

13   Mr. Scaggs, insights from you and other folks are

14   always helpful.

15                All right.  Let me go through my tasks

16   for today.  This hearing is for me to consider the

17   proposed settlement in Turberg v. ArcSight 5821-VCL.

18   This settlement will also resolve claims in a related

19   action pending in California, In Re ArcSight

20   Shareholder Ligtigation, Case No. 110-CV-182474.  The

21   litigation concerns the purchase of ArcSight by

22   Hewlett-Packard Company.  The parties have stipulated

23   to a nonopt-out class for purposes of settlement,

24   defined as all record and beneficial holders of shares

40

1    of ArcSight common stock, at any time from

2    September 13, 2010 through and including October 22nd,

3    2010, including successors in interest, predecessors,

4    et cetera.  That class is reasonable and adequately

5    cohesive.  The boundaries which start from the date of

6    the announcement of the tender offer and go through

7    the date of the closing of the acquisition make good

8    sense and properly define the class.

9                    In terms of the Rule 23(a)

10   requirements, numerosity is readily met.  As of

11   September 1st, 2010, there were 34.45 million ArcSight

12   shares outstanding held by thousands of beneficial

13   holders.

14                   In terms of commonalty, the plaintiffs

15   allege common injuries arising from the defendants'

16   actions that affected all stockholders equally.

17                   In terms of typicality, the class

18   members were affected in their capacity as

19   shareholders and face the same injury from the same

20   conduct.  Each one of those is satisfied.

21                   In terms of adequacy of

22   representation, the plaintiff was indeed a holder of

23   ArcSight stock and retained experienced counsel.

24   These fast-fuse settlements, I think, push the limits

1   on what is adequate representation.  Mr. Monteverde

2   gave me a good explanation this morning that he got

3   into this because of the top-up option.  When I

4   originally was looking at this last night, and in the

5   preceding days talking about it with my clerks, this

6   looked like an arm's-length deal at a significant

7   premium where the plaintiff filed three days after the

8   announcement of the transaction, before the

9   preliminary proxy was out.  Really, there wasn't a lot

10   done.  There were 2,300 documents obtained, no pre-MOU

11   depositions taken.  I'm not asking people to churn,

12   but there wasn't much done here and folks ultimately

13   got a package, a combo platter, to use

14   Blake Rohrbacher's phrase, of disclosures, some of

15   which are nice, none of which are earth shattering,

16   some of which are -- I'll just use the

17   word unimpressive.  So I think about whether or not

18   (a)(4) was met.  But Mr. Monteverde has done a good

19   job explaining to me this morning that it was a

20   different world in September 2010.  It made sense to

21   get into this because of the top-up option.  So I will

22   hold that (a)(4) also is met.

23           In terms of the Rule 23(b)(3)

24   requirements, certification under (b)(1) is

1    appropriate because the prosecution of separate

2    actions by individual stockholders would have risked

3    inconsistent and varying results. Certification under

4    (b)(2) is also appropriate because the relief is

5    generally applicable to the class. It would have

6    taken the form of declaratory or likely

7    injunction-type relief. Here the disclosures are

8    classwide and generally applicable to the class.

9                    Finally, the requirements of

10   Rule 23(aa) and Rule 23(e) have been met. I have

11   reviewed the affidavits of Mr. Turberg and they

12   satisfy the rules. Therefore I'm certifying this

13   class as a nonopt-out class pursuant to Rules 23(b)(1)

14   and (b)(2) of the Court of Chancery.

15                    In terms of notice, the notice was

16   provided in compliance with Rule 23(e). It accurately

17   described the lawsuit at page two. It actually

18   described the consideration of the settlement at page

19   three. It gave the location and time of this hearing

20   at page one and five, and it informed class members

21   where to go if they wanted further information. It

22   was adequately delivered. The affidavit of

23   Carole K. Sylvester of Gilardi & Co. LLC affirms that,

24   as of September 6th, 2011, notice was mailed to 7,776

1   potential class members and nominees.

2                   In terms of the merits of the

3   settlement, this is another one where I thought hard

4   about it.  In terms of the combo platter of

5   disclosures, particularly the bankers' disclosures,

6   there are things that I think are very helpful.  The

7   additional information is information that, I think,

8   if you were to consider what really constitutes a fair

9   summary, then the background multiples should be in

10  there, just like they're in there when you give them

11  to the board.

12                  As I suggested in my conversation with

13  Mr. Monteverde, you would never see a board book that

14  would go to the board without the background

15  multiples.  You would never expect the board to simply

16  hear from the banker, "Oh, well, we selected the

17  range."  And one would not want to defend the due care

18  injunction case where that was the situation.  So I

19  think that that information was certainly helpful and

20  important and supports the settlement.  Some of the

21  other things on the combo platter I am less enthused

22  by.

23                  Although the settlement here was

24  relatively small consideration, it was small

1   consideration for quite weak claims.  The principal

2   claim here was a Revlon claim challenging the price

3   and defensive measures.  But the price was really a

4   substantial premium.  And although I am not one who

5   thinks that premium standing alone is evidence of good

6   conduct (one could just as easily get a premium in a

7   hot market where one, had one acted as a responsible

8   fiduciary, could get a bigger premium), this is a

9   situation where, when you read the background of the

10  merger, Morgan Stanley and the board here appear to

11  have done a fine job.  It's hard to quibble with what

12  happened.  They didn't go exclusive.  They contacted

13  six other companies.  They negotiated hard on price.

14  They didn't take the initial deal.  This was a process

15  that really looked good.  So that's another reason why

16  it was strange to me that this was a case that

17  inspired allegations about fiduciary breach, because

18  not only was it a good premium but it was a case

19  where, when you read the background of the merger, at

20  least my impression was that these were properly

21  motivated, well-advised fiduciaries who were doing a

22  great job.  Part of me wondered why this wasn't a

23  situation where the plaintiffs might have just said,

24  "Hey, you know what?  We filed this but there's not

1   much here.  We're going to go away."  Ultimately, the

2   claims were quite weak and the disclosures do provide

3   sufficient consideration for a settlement.

4               Now, in terms of attorneys' fees,

5   Delaware's goal in awarding attorneys' fees is to

6   provide real rewards for plaintiffs who file real

7   claims and do real work.  Our goal is not to confer

8   socially unwholesome windfalls on people who simply

9   file upon the announcement of a transaction and then

10  don't do very much.  What I have said and what I stand

11  by is that I am going to give some deference to the

12  negotiations of counsel when I think the disclosures

13  fall within the type of range that is not irrational,

14  even if the Court would likely have come to a

15  different view had I considered the matter myself.

16              Here there were disclosures that

17  provide helpful information about the banker's

18  background.  There were some other helpful

19  disclosures.  Had this been a really litigated and

20  contested fee petition, I would have gone through

21  those and given you greater detail about my thoughts

22  and what they were worth.  But because counsel has

23  negotiated the not-outlandish fee of $500,000 for

24  these, I will go ahead and approve the settlement as

 1  submitted.

 2              MR. MONTEVERDE:  Would Your Honor like

 3  a copy of --

 4              THE COURT:  Miss Keener was kind

 5  enough to send me a copy.

 6              MR. MONTEVERDE:  Yes, Your Honor.

 7  Thank you.

 8              THE COURT:  So I have it.  I'm writing

 9  this down.

10              MR. MONTEVERDE:  I think it's page

11  eight.

12              THE COURT:  I got it.

13              MR. MONTEVERDE:  Thank you, Your

14  Honor.  Sorry.

15              THE COURT:  And I should note that I

16  do not plan to rely on this fee award as an indication

17  of the value of any aspect of this settlement, to the

18  extent there's a future contested proceeding.  I was

19  heavily influenced by the fact that experienced

20  counsel negotiated the amount.  As I say, it was not

21  an outlandish number to come to for a disclosure

22  settlement.  I have said myself that you start from a

23  $4-500,000 range.

24              I'm also influenced by the fact that,

1   although I think that the payment conceivably could be

2   rich, one could view this as a helpful incentive in

3   terms of trying to get people to put banker disclosure

4   that is more of a fair summary in the initial document

5   as opposed to leaving it out.

6               So I'm handing this to the clerk.  I

7   appreciate everyone coming in today.  Mr. Monteverde,

8   it's always good to see you.  I appreciate your

9   thorough presentation.  Mr. Scaggs, it was good to

10  have your comments.  It's good to see everyone else.

11  Thank you all for your time, and we stand in recess.

12               (Court adjourned at 10:54 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

48

1                        CERTIFICATE

2                 I, DIANE G. McGRELLIS, Official Court

3   Reporter of the Chancery Court, State of Delaware, do

4   hereby certify that the foregoing pages numbered 3

5   through 47 contain a true and correct transcription of

6   the proceedings as stenographically reported by me at

7   the hearing in the above cause before the Vice

8   Chancellor of the State of Delaware, on the date

9   therein indicated.

10                 IN WITNESS WHEREOF I have hereunto set

11  my hand at Wilmington, this 28th day of September,

12  2011.

13

14                  /s/ Diane G. McGrellis
                 ---------------------------
15                  Official Court Reporter
                   of the Chancery Court
16                    State of Delaware

17

18  Certification Number: 108-PS
    Expiration:  Permanent
19

20

21

22

23

24